[Crim. No. 22855. May 16, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH CARLOS POGGI, Defendant and Appellant.

**COUNSEL**

Robert L. Walker, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John R. Gorey, William R. Weisman and Ellen Birnbaum Kehr, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PANELLI, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190.1 et seq.). Defendant was convicted of the robbery (*id.*, § 211), rape (*id.*, § 261, subd. (2)), and murder (*id.*, § 187) of Patricia Musgrove and the burglary of her residence (*id.*, § 459), and of the assault with a deadly weapon (*id.*, § 245, subd. (a)) and rape (*id.*, § 261, subd. (2)) of B. V. Three special circumstances were found true: (1) felony murder-robbery (*id.*, § 190.2, subd. (a)(17)(i)); (2) felony murder-rape (*id.*, subd. (a)(17)(iii)); and (3) felony murder-burglary (*id.*, subd. (a)(7)(vii)).

Defendant pleaded not guilty and not guilty by reason of insanity. Pursuant to Penal Code section 1027, the court appointed two psychiatrists, Saul Faerstein and Kaushal Sharma, to examine defendant and deliver an opinion as to whether he was sane at the time of the crimes charged. After Drs. Faerstein and Sharma filed their reports, finding that defendant was sane, defendant withdrew his plea of not guilty by reason of insanity.

Before trial defendant moved to sever the charges relating to B. V. from those relating to Musgrove. He was unsuccessful.

## I. GUILT PHASE

A. *Facts.*

At trial the prosecution established beyond dispute the core of facts relating to the incidents in question: On December 15, 1980, defendant was living with his sister, mother, and other family members at 4918-1/4 Santa Ana Street in Cudahy in Los Angeles County; about 8 a.m. on that day B. V., aged 68, was assaulted and raped nearby; later that same morning someone entered the house Patricia Musgrove, aged 24, shared with her husband and son at 4916 Santa Ana Street, stabbed her several times in the chest, and fled; about 3 p.m. that afternoon Musgrove died.

B. V. testified that as she was walking on a street in Cudahy on the morning in question, a man approached her and said, "Merry Christmas"; he then took her arm and stated, "Let's take a shortcut"; she said, "No," but the man put a straight-edged butcher knife to her throat and took her behind a building; he ordered her to undress, she refused, he put the knife to her throat again, and she complied; although he failed to achieve a full erection or to ejaculate, he succeeded in partially penetrating her; he then walked away. In open court B. V. identified defendant as her assailant.

Officer Nasario Flores of the Bell Police Department testified that in response to a call he arrived at Patricia Musgrove's house about 11 a.m. on December 15; he found Musgrove in a very excited state, with blood flowing from her mouth and puffiness under one of her eyes; she was apparently attempting to recount what had happened to her but was rambling and incoherent; he subsequently succeeded in calming her down a little.

When the prosecutor attempted to question Flores on whether Musgrove made any statements and if so, what they were, defense counsel objected on hearsay grounds. Outside the presence of the jury the prosecutor sought to have the declarations admitted under the spontaneous statement exception of Evidence Code section 1240. In support of his position he elicited the

following foundational testimony from Flores: the attack apparently occurred about 10:30 a.m.; when he arrived Musgrove expressed a belief that the perpetrator might still be in the house; because her narrative was incoherent he decided to attempt to draw information from her by asking what happened; she showed him that she was bleeding profusely from several wounds to her chest; during questioning she remained excited and several times had to be told to slow down and to become calm; his questioning lasted between 15 and 20 minutes—almost all of it while paramedics were attempting to treat her wounds. Thereupon the court ruled in effect that Musgrove was excited and unreflective and that her declarations relating to the attack were admissible under the spontaneous statement exception.

Resuming his testimony in the presence of the jury, Officer Flores repeated in substance what he had observed about Musgrove and the crime scene at the time of his questioning. He then recounted her statements: the perpetrator was a stranger; he came into her home; he had a knife; he took about $90; he beat her up; he raped her in her son's bedroom; he forced her to fill the bathtub, said he was going to drown her, and attempted to do so; they fought in the tub, and he was unsuccessful; he then said, "I gotta stab you. You gotta die," and he stabbed her; she first identified her attacker as Black or very dark complected and subsequently answered yes to a question whether he could be Mexican. Flores also testified that a serrated steak knife bearing the name "Interpur" was found in the house with its blade bent and stained with what appeared to be blood.

Later that day, Flores continued, he went to the house at 4918-1/4 Santa Ana Street; he was let in by defendant's sister, Philomena Sepulveda, and soon found defendant hiding underneath a bed; he made the arrest; before leaving he discovered a pair of men's shoes that were wet to the touch and a set of "Interpur" serrated steak knives matching the knife found in the Musgrove residence.

Alexandra Panigua testified that on December 15 she lived at 4916-1/2 Santa Ana Street and had previously seen defendant in the neighborhood; about 10:30 a.m. that day she saw him walking from the Musgrove residence at 4916 Santa Ana Street toward his own at 4918-1/4 Santa Ana Street; he had wet spots on his shirt and pants and blood on his hands and arms.

Philomena Sepulveda stated that on December 15 she awoke about 9:20 a.m. and saw defendant leave the house approximately 10 minutes later; on arriving home later that morning he was nervous and shaking, bore scratches or red marks on his upper chest, had blood on his arm and chest, and his shirt, pants, and shoes were wet; he told her that he was bloody

because he had been in a fight with some Black men over money he owed them and that he was wet because he had gone through some sprinklers and had fallen. She identified the knife found at the Musgrove residence as matching some knives at her family's house.

Richard Linhart, a criminologist in the serology laboratory of the Los Angeles Sheriff's Department, analyzed bloodstains associated with the incidents at the Musgrove residence and testified as an expert as follows: blood was detected on the knife found at the scene and could have come from Patricia Musgrove; he subjected a bloodstain found on the bathroom cabinet to six different blood-typing systems, determined there was no difference between the stain and defendant's blood, concluded defendant was not excluded as a source, and calculated he was one of the thirteen persons in every one hundred thousand who could have produced it; he subjected a bloodstain found on the bathroom wall to only three different blood typing systems because of the small quantity of the sample, determined there was no difference between the stain and defendant's blood, concluded defendant was not excluded as a source, and calculated he was one of three persons in every one hundred who could have produced it. During Linhart's testimony defense counsel unsuccessfully objected to and moved to strike the probability calculations as misleading and irrelevant.

After the prosecution rested, defendant moved for acquittal on all counts under Penal Code section 1118.1. The court granted the motion as to the charge alleging the kidnapping of B. V. and denied it as to the rest.

With the exception of Sergeant John McCrane of the Los Angeles Sheriff's Department, the defense called no witnesses. Sergeant McCrane's testimony consisted solely of the statement that he had inspected the Musgrove residence on December 15 and found no sign of forced entry.

B. *Guilt Phase Issues.*

Defendant makes a number of contentions relating to the question of guilt. None, as we shall explain, establishes reversible error.

1. *Musgrove's Statements.*

Defendant's central claim is that Patricia Musgrove's extrajudicial statements were inadmissible hearsay and hence that the court erred in receiving them into evidence. The Attorney General responds that the declarations come within the spontaneous statement exception to the hearsay rule. We agree.

Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) was made spontaneously while the declarant was under the stress of excitement caused by such perception."

Section 1240 is the codification of an established common law exception to the hearsay rule. (*People* v. *Washington* (1969) 71 Cal.2d 1170, 1176 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541]; Tent. Recommendation and Study Relating to the Uniform Rules of Evidence, art. VIII, Hearsay Evidence (Aug. 1962) 6 Cal. Law Revision Com. Rep. (1964), appen. pp. 465-466.)

■ "To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." (*Showalter* v. *Western Pacific R.R. Co.* (1940) 16 Cal.2d 460, 468 [106 P.2d 895]; accord, *People* v. *Washington, supra,* 71 Cal.2d at p. 1176.)

"The foundation for this exception is that if the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury. [Citation.] [¶] The basis for this circumstantial probability of trustworthiness is 'that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief.'" (*Showalter* v. *Western Pacific R.R. Co., supra,* 16 Cal.2d at p. 468.)

■ Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. (See, e.g., *People* v. *Washington, supra,* 71 Cal.2d at pp. 1176-1177.) The determination of the question is vested in the court, not the jury. (E.g., *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 966, fn. 13 [127 Cal.Rptr. 135, 544 P.2d 1335].) In performing this task, the court "necessarily [exercises] some element of discretion . . . ." (*Showalter* v. *Western Pacific R.R. Co., supra,* 16 Cal.2d at p. 469.)

Because the second requirement relates to the peculiar facts of the individual case more than the first or third does (see 6 Wigmore, Evidence

(Chadbourn rev. ed. 1976) § 1750, pp. 202-222 [hereafter Wigmore]; *People v. Jones* (1984) 155 Cal.App.3d 653, 662 [202 Cal.Rptr. 289], following Wigmore), the discretion of the trial court is at its broadest when it determines whether this requirement is met (see *Showalter* v. *Western Pacific R.R. Co., supra,* 16 Cal.2d at pp. 468-469). Indeed, Dean Wigmore goes so far as to urge that the issue should be left "absolutely to the determination of the trial court." (6 Wigmore, *supra,* § 1750, p. 221, italics deleted.)

■ Impliedly conceding, as he must, that the first and third requirements of the exception are satisfied, defendant argues that the second is not. Specifically, he disputes the court's finding that Musgrove's statements were made in excitement and without reflection, arguing that they were delivered about 30 minutes following the attack, in response to questioning, and after she had been calmed down sufficiently to be able to speak coherently.

We cannot say that the trial court abused its discretion in finding that Musgrove's statements were spontaneous within the meaning of the exception.

When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity. (See *McClaflin* v. *Bayshore Equipment Rental Co.* (1969) 274 Cal.App.2d 446, 454 [79 Cal.Rptr. 337]; *Wiley* v. *Easter* (1962) 203 Cal.App.2d 845, 854-855 [21 Cal.Rptr. 905].) ■ But as we emphasized in *People* v. *Washington,* "Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*" (71 Cal.2d at p. 1176, italics added.)

Under the same reasoning, the fact that the declarant has become calm enough to speak coherently also is not inconsistent with spontaneity. (*People* v. *Jones, supra,* 155 Cal.App.3d at p. 662; *People* v. *Francis* (1982) 129 Cal.App.3d 241, 254 [180 Cal.Rptr. 873].) To conclude otherwise would render the exception virtually nugatory: practically the only "statements" able to qualify would be sounds devoid of meaning.

■ Here the record supports the finding of spontaneity. First, although Musgrove made the statements at issue about 30 minutes after the attack, it is undisputed that she was still under its influence. Second, it is also undisputed that she remained excited as she made the statements, even though she had become calm enough to speak coherently. Finally, the fact that the statements were delivered in response to questioning does not render them

nonspontaneous. With one exception Officer Flores's questions appear to have been simple and nonsuggestive—in substance, "What happened?", "What happened then?", and so on.

The single exception concerns the question whether the attacker could be Mexican. Such an inquiry may in some cases deprive a response of spontaneity by effectively placing words into the declarant's mouth or at least causing him to reflect and recollect himself before he answers. This, however, is not such a case. In view of Musgrove's emotional and physical state—she was excited and bleeding profusely from multiple and ultimately fatal stab wounds to the chest—we cannot say that the questions rendered her response "reflective" for purposes of the exception. Nor can we say Officer Flores effectively placed words into her mouth: he asked his question after she identified her attacker as Black or very dark complected and thereby merely elicited a clarification of her original statement.

Because the record supports the finding that Musgrove's statements were spontaneous, we are presented with no reason to disturb the court's determination. The admission of the statements, accordingly, was not error.

2. *Severance Motion.*

Defendant contends the court erred in denying his motion to sever the counts relating to Musgrove from those relating to B. V.

■ Penal Code section 954 provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . [p]rovided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

There is no question that the joinder was proper. The offenses defendant was accused of perpetrating on Musgrove were obviously "connected together in their commission," as were those involving B. V. Further, both groups of charges essentially embrace "offenses of the same class"—viz., "assaultive crime[s] against the person . . . ." (*People* v. *Rhoden* (1972) 6 Cal.3d 519, 525 [99 Cal.Rptr. 751, 492 P.2d 1143] [discussing kidnapping, robbery, and rape].)

Since the statutory requirements for joinder were clearly met in this case, defendant can predicate error only on a clear showing of potential

prejudice. (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].) In this area as in others, "a determination of prejudice is a highly individualized exercise, necessarily dependent upon the particular circumstances of each individual case." (*Id.*, at p. 452.)

Defendant argues in effect as follows: As a result of joinder evidence relating to both the Musgrove and B. V. groups of charges would be introduced in a single trial; if the cases were severed, evidence pertaining to one group would not be admissible on the other under the rules limiting the use of other-crimes evidence; consequently, the denial of his severance motion would result in the introduction of evidence that would not be admissible in separate trials.

The first step in assessing whether severance should be granted is to examine the issue of cross-admissibility of evidence. Since cross-admissibility would ordinarily dispel any possibility of prejudice, we must inquire whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 171-172 [222 Cal.Rptr. 184, 711 P.2d 480].)

The People assert that there were a number of similarities in the B. V. and Musgrove crimes. They were both attacks on women the same morning of the same day, in the same neighborhood, using a knife as a weapon. Both women were raped; Musgrove, however, was robbed, and stabbed as well. Defendant counters that these similarities are not distinctive enough that they logically tend to isolate the same person as the perpetrator of both. (See *People* v. *Thornton* (1974) 11 Cal.3d 738, 755-760 [114 Cal.Rptr. 467, 523 P.2d 267].)

■ Even if evidence on the joined charges would not have been cross-admissible in separate trials, a court does not necessarily abuse its discretion by joining the cases for trial, for the court's discretion in refusing to sever a case is broader than its discretion in admitting evidence of uncharged offenses. (See *People* v. *Balderas, supra,* 41 Cal.3d 144, 172-173.) A defendant must prove a "substantial" or "clear" prejudice in order to establish an abuse of discretion arising from a failure to sever; mere lack of cross-admissibility or the existence of capital charges is not enough. (*Id.*, at p. 173.)

■ Defendant asserts that there was prejudice because the stronger evidence on the B. V. rape charge bolstered the weaker evidence on the Musgrove rape charge. His premise is faulty, however, for the evidence on the Musgrove charge was not weak. The victim herself said she had been

raped, and the circumstances of the utterance strongly support its reliability.

There was strong evidence on each group of charges. As to those involving B. V., the victim herself testified that on the morning of December 15, 1980, a man assaulted her with a knife and raped her; she saw the perpetrator; and he was defendant. Her identification was not weak, as defendant alleges. She selected defendant's picture in a photographic lineup a few days after the attack. At the preliminary hearing she hesitated when she first looked at him but then identified him from his eyes: on December 15, 1980, he had long hair and a beard or moustache; at the preliminary hearing his hair was short and his face clean-shaven.

As to the Musgrove charges, the victim herself stated that a stranger had entered her home, he had a knife, took about $90, beat her, raped her in her son's bedroom, attempted to drown her in the bathtub and struggled with her in it, said "I gotta stab you. You gotta die," and then stabbed her. Strong circumstantial evidence pointed toward defendant as the perpetrator. He had been seen walking from Musgrove's house to his own, wet and bloody, about the time the attack on Musgrove had ended. He was found hiding under the bed at his house; wet and bloody clothes were found hanging outside.

No clear or substantial prejudice has been shown from joinder of the two sets of charges. Nor are any of the other factors present that sometimes warrant a severance. No unusually inflammatory offenses, such as child molestation or gang warfare, were involved. (See *Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 453.) Moreover, unlike the situation in *Williams,* joinder of the two sets of charges did not convert the case into a capital case. Accordingly, we conclude that defendant has not shown that the court abused its discretion in denying his motion to sever.

3. *Photographs.*

■ Defendant contends two photographs should not have been admitted into evidence: People's exhibit No. 3 which depicts Musgrove while still alive, standing with her husband and son before a Christmas tree; and People's exhibit No. 4, an autopsy photograph, which shows an incision surgeons made in Musgrove's neck in performing a tracheotomy in an attempt to save her life, but does not reveal any of the stab wounds she sustained. When the prosecutor offered these photographs into evidence, defense counsel objected on grounds of relevance and prejudice, stating in substance that he would stipulate to the fact that Musgrove was a human being, that she was alive before the attack, and that she had died. The

prosecutor refused the offer. He then stated that he was offering the photographs for "identification" and the court received them into evidence for that purpose.

The admission of the photographs was error. It is true, as the People argue, that the admissibility of photographs lies primarily in the discretion of the trial court. (E.g., *People* v. *Turner* (1984) 37 Cal.3d 302, 321 [208 Cal.Rptr. 196, 690 P.2d 669].) But it is also true that the court has no discretion to admit irrelevant evidence. (*Ibid.*; Evid. Code, § 350.) The photographs here are not relevant to any disputed material issue. The only matters on which they have probative value are the following: Musgrove was a human being; she was alive before the attack; and she is now dead. In view of defense counsel's offer to stipulate, these issues were removed from the case as matters in dispute. When, as here, " 'a defendant offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence . . . to prove that element to the jury.' " (*People* v. *Ramos* (1982) 30 Cal.3d 553, 577 [180 Cal.Rptr. 266, 639 P.2d 908], revd. on other grounds *sub nom. California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446].)

Under the facts of this case, however, the error was not prejudicial. As we have observed, the evidence against defendant was strong. Moreover, People's exhibit No. 4 does not appear unduly gruesome, nor does People's exhibit No. 3 seem likely to have appreciably intensified whatever feelings— whether of hostility toward defendant or sympathy toward his victim—that the jury may have developed in this case. Thus, we cannot conclude that it is reasonably probable a result more favorable to defendant would have been reached in the absence of the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 4. *Serological Evidence.*

■ Defendant contends the court erred in admitting the expert serological testimony of Richard Linhart. In his argument he raises two points: (1) the prosecution failed to satisfy the *Kelly/Frye* rule (*People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C.Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145]) by demonstrating at trial the scientific acceptance of the tests performed and hence their reliability; and, in any event, (2) under *People* v. *Collins* (1968) 68 Cal.2d 319, 329-330 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176], evidence of statistics showing a mathematical "probability of guilt" may mislead the jury and is in fact irrelevant.

Defendant may not now complain of the prosecution's failure to prove the reliability of the tests Linhart performed. At trial defense counsel ob-

jected to this testimony on the sole ground that evidence of statistical probabilities is inadmissible. On cross-examination he did not inquire what Linhart's qualifications were, what tests he performed, or whether those tests had received acceptance in the scientific community. Had defendant made a proper objection going to reliability, the claimed error could have been addressed. "Because of [his] failure to make a timely and specific objection on this ground, . . . the point must be deemed waived." (*People* v. *Green* (1980) 27 Cal.3d 1, 22 [164 Cal.Rptr. 1, 609 P.2d 468].)

But even if the issue were deemed to have been preserved on appeal, we would nevertheless be compelled to reject it. Some serological tests have long been recognized as reliable. (E.g., *Huntingdon* v. *Crowley* (1966) 64 Cal.2d 647, 653-656 [51 Cal.Rptr. 254, 414 P.2d 382] [ABO, MN, and Rh tests].) Because of defendant's failure to object to the reliability of the tests performed or even to inquire as to their identity, we do not know what tests were actually conducted and therefore cannot hold them unreliable.

As to defendant's second point, both California and the majority of other jurisdictions have traditionally admitted statistical blood-group evidence of this kind in criminal cases, even where it simply includes the accused within the class of possible donors. (See *People* v. *Brown* (1985) 40 Cal.3d 512, 536, fn. 6 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]; *People* v. *Lindsey* (1978) 84 Cal.App.3d 851, 863-866 [149 Cal.Rptr. 47, 2 A.L.R.4th 485], and cases cited; *People* v. *Vallez* (1978) 80 Cal.App.3d 46, 56 [143 Cal.Rptr. 914]; see generally Annot. (1980) 2 A.L.R.4th 500, 511 et seq.)

Moreover, even if it had been error to admit the statistical blood-group evidence, such error would have been harmless under the *Watson* test. (*People* v. *Watson, supra,* 46 Cal.2d 818 at p. 836.) As we have shown, the combination of properly admitted direct and circumstantial evidence leaves little doubt that defendant was the perpetrator of the crimes committed at the Musgrove residence.

5. *Sufficiency of Evidence.*

Defendant's final guilt phase contention is that the evidence adduced at trial is insufficient to support the Musgrove burglary, rape, and robbery convictions.

�as In reviewing the sufficiency of evidence, the question we ask is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt.'" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) In our review, we "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].)

Defendant does not maintain here that he is not the person who did whatever was done at the Musgrove residence on the morning of December 15, 1980. Nor could he: the evidence presented at trial establishes without dispute that on that morning he left his house around 9:30; Musgrove struggled with her attacker and fought with him in a bathtub full of water; certain blood stains at the scene associated with the attack could have been produced by him but not by Musgrove; the apparent murder weapon matched knives found at his house; about the time the attack apparently ended he was seen walking from the Musgrove residence toward his house with wet spots on his shirt and pants and blood on his hands and arms; on arriving home he was nervous and shaking, bore scratches or red marks on his upper chest, had blood on his arm and chest, and his shirt, pants, and shoes were wet.

Defendant does argue, however, that the evidence is insufficient to prove that he committed burglary, robbery, and rape at the Musgrove residence on the day in question. He is unpersuasive.

Burglary is the entering of a building "with intent to commit . . . larceny or any felony . . . ." (Pen. Code, § 459.) Defendant was charged with, and found guilty of, entering the Musgrove residence with larcenous intent. The evidence is sufficient to support the conviction: a rational trier of fact could certainly have found that defendant entered the house of a stranger armed with a knife, that he stole about $90, and that he entered the house with the intent to do precisely what he did.

Robbery, as defined by Penal Code section 211, is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." A rational trier of fact could surely have found or deduced from the evidence set forth at trial all of the elements of the crime of robbery—viz., that defendant took $90 belonging to Musgrove against her will, that the money was on her person or in her immediate presence, and that he beat her to get it.

Defendant argues in effect that the evidence also allows an inference that the money was not on Musgrove's person or in her immediate possession or that it was taken without force or fear. For argument's sake

we shall grant the point. But because guilt could reasonably be inferred beyond a reasonable doubt, it does not matter that innocence could also have been inferred. (*People* v. *Green, supra,* 27 Cal.3d at pp. 55-57.)

As relevant to our review, "rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . accomplished against a person's will by means of force, violence or fear of immediate and unlawful bodily injury on the person . . . ." (Pen. Code, § 261, subd. (2).) ■ In California conviction of a sex crime may be sustained upon the uncorroborated testimony of the prosecutrix. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 571 [146 Cal.Rptr. 859, 580 P.2d 274].) In this case the jury was presented with Musgrove's statement that she was raped.

## II. SPECIAL CIRCUMSTANCE ISSUES

Defendant makes a number of claims attacking the validity of the special circumstance findings. As will appear, he is unsuccessful.

### A. *Intent to Kill.*

■ Defendant contends that the special circumstance findings must be vacated on the ground that the court failed to instruct on intent to kill. The point must be rejected.

We overruled *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] and held that, with respect to the actual killer, the court need not instruct on intent in connection with felony-murder special circumstances. Such an instruction is required only when there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer. (*Id.,* at pp. 1138-1139.) Here, all the evidence showed that defendant either actually killed Musgrove or was not involved in the crime at all; there was no evidence that he was an accomplice. Accordingly, the court did not err in failing to instruct the jury on intent.

■ Relying on *Bouie* v. *City of Columbia* (1964) 378 U.S. 347 [12 L.Ed.2d 894, 84 S.Ct. 1697], defendant argues that retroactive application of our decision in *Anderson* violates federal due process. *Bouie* overturned convictions of "sit-ins" who refused to leave a restaurant on request, rendered under a statute which on its face appeared to punish only entry after notice prohibiting entry (as distinct from remaining after an order to leave). The state court's construction of the statute was held so unforeseeable as to

deprive the defendants of fair warning that their conduct would be held illegal.

No such unforeseeability existed here. Defendant stands convicted of a murder that preceded *Carlos*. *Carlos* itself concluded that the statute was ambiguous with respect to the requirement of intent to kill for a felony-murder special circumstance. (See *People* v. *Anderson, supra,* 43 Cal.3d at p. 1143.) There was ample basis for pre-*Carlos* foreseeability of a holding that such intent is not required for the actual killer. (*People* v. *Anderson, supra,* 43 Cal.3d at pp. 1138-1147.)

B. *Sua Sponte Instruction.*

Defendant contends that in instructing the jury that it was required to find that "the murder was committed *while the defendant was engaged in* the commission of a rape, robbery, burglary, or any or all of these offenses" (italics added) before it could return a finding that the special circumstance was true, the court was obligated but failed to explicate the meaning of the italicized clause. Specifically, he claims the court should have explained that there must be no "cognizable interruption" separating the murder and the other offense or offenses. For argument's sake we shall assume that the clause in question means what defendant says it does. Nevertheless, for the reasons that follow we are compelled to reject his point.

The law applicable here is clear. The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language. (*People* v. *Page* (1980) 104 Cal.App.3d 569, 577 [163 Cal.Rptr. 839].)

The portion of the instruction at issue in this case was drawn verbatim from Penal Code section 190.2, subdivision (a)(17). Defendant, however, failed to request further amplification. Finally, a jury would have no difficulty in understanding the statutory language without guidance. Accordingly, the court was not obligated to explicate the clauses in question.

C. *Sufficiency of Evidence.*

Defendant contends that the special circumstance findings are not supported by sufficient evidence. He argues as follows: in order to find that he committed the murder while engaged in the commission of burglary, robbery, or rape, the jury was required to find that there was no "cognizable

interruption" separating the murder and the underlying felony; the evidence, however, is insufficient to support such a finding. Even if we assume for argument's sake that defendant's premise is sound, we cannot accept his conclusion. From the evidence adduced at trial, a jury could find that the acts at Musgrove's home constituted a single, continuous and relatively brief transaction, and hence were not separated the one from the other by any "cognizable interruption."

### III. PENALTY PHASE

#### A. *Facts.*

At the penalty phase the prosecution took the position that defendant's life of violence, which included an earlier rape of one Alice H. in addition to the crimes tried in the present proceeding, warranted the imposition of the penalty of death.

Before calling Alice H., who was its sole witness in its case-in-chief, the prosecution introduced a superior court file showing that defendant had been convicted of raping her and had been adjudged a mentally disordered sex offender. It then called Alice H. herself. She testified in substance as follows: on the date of the incident in question, she was conversing with defendant in her house; she had known him and his family for several years, since the time he and her sons had become friends in school; during their conversation he suddenly grabbed her by the neck, said, "I want to make love to you," and then proceeded to rape her; before, during, and after the act he stated repeatedly, "I gotta kill you. I gotta kill you"; following the rape he attempted to strangle and smother her and beat her, and then said, "Oh my God, what have I done, what have I done," and apologized repeatedly; he asked her to forgive him and forget what had happened and not to call the police; she agreed in order to get him to leave; he stated that if she did report the incident, he would return to kill her; he then left.

The position of the defense was in substance as follows: defendant was not deserving of the punishment of death; he was extremely mentally ill and as such required massive doses of antipsychotic drugs to make him even marginally manageable; he had been known to be extremely mentally ill since he was adjudged a mentally disordered sex offender; he should never have been released from a strictly supervised institutional setting; as a result of negligence and conduct even more blameworthy on the part of the state, however, he was released and soon thereafter perpetrated the crime in question.

In support of its position the defense called defendant's mother, Leola Sepulveda, David Guthman, a deputy district attorney who was the head of

the psychiatric section of the prosecutor's office, and two psychiatrists, James Vargas and John Stalberg.

Sepulveda testified that shortly before his sixth birthday defendant was struck by a truck and went into a coma lasting 29 days, had never acted normally thereafter, but was nevertheless a good person. Guthman testified about defendant's history in the state hospital system following his adjudication as a mentally disordered sex offender. He described, among other things, his successful efforts to obtain a one-year extension of defendant's commitment to Atascadero State Hospital after the determinate sentencing law was enacted; he told of defendant's transfer to Patton State Hospital; and he described his unsuccessful efforts to persuade the authorities at that hospital to seek another extension. Dr. Vargas testified that defendant suffered from schizophrenia and required large doses of antipsychotic drugs to become even marginally manageable. Dr. Stalberg stated that defendant had a history of organic brain damage, schizophrenia, and auditory hallucinations. It was his opinion that at the time of the crimes in question, defendant was mentally ill and suffering from an extreme mental disorder. It was also his opinion, however, that defendant's mental illness was not of such a nature and degree as to negate or diminish criminal culpability.

In rebuttal, the prosecution called Drs. Kaushal Sharma and Saul Faerstein, who had examined defendant on the issue of sanity pursuant to Penal Code section 1026. Dr. Sharma testified that although defendant was mentally ill at the time of the crimes in question, he was not "crazy or otherwise peculiar" but decided to kill Musgrove to prevent identification. Dr. Faerstein stated that he found evidence of chronic schizophrenia, organic brain syndrome, and sociopathy. He also stated, however, that "Although there is a clear history of mental illness in [defendant], I do not believe that it was substantially related to the commission of these offenses," and that "I believe that the instant offenses were committed for sexual gratification, and he attempted to kill one of his victims to avoid identification."

The jury returned a verdict imposing the death sentence and the court entered judgment accordingly.

Defendant makes several contentions going to the issue of penalty. As will appear, none is meritorious.

B. *Penalty Phase Issues.*

1. *Testimony of Drs. Sharma and Faerstein.*

In reliance on *Estelle* v. *Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866], defendant contends that the admission of the testimony of Drs.

Sharma and Faerstein at the penalty phase violated his Fifth Amendment privilege against compelled self-incrimination.

At the penalty phase defense counsel sought to strike the testimony of Dr. Sharma and to bar the testimony of Dr. Faerstein on the ground, among others, that neither psychiatrist gave defendant the advisement required by *Smith.* At the hearing on the motion, Dr. Faerstein testified: "I did not specifically discuss the penalty phase with him. I did discuss with him the fact that there was no confidentiality in his disclosures to me; that I was reporting everything that I would discover in the process of the evaluation to the court; that my letter would go to the court, and that nothing he would say to me would be private or confidential." Although Dr. Sharma did not testify at the hearing, his Penal Code section 1026 report does state that "defendant was informed about the non-confidential nature of the examination." It was undisputed that neither psychiatrist advised defendant that he had a right to remain silent or that any statement he made could be used against him at the penalty phase of his trial.

The court denied defendant's motion. In rejecting the request to strike Dr. Sharma's testimony, it said the motion was "untimely" but plainly rested its ruling on the merits: "I don't think the People should be penalized after the fact for introducing psychiatric testimony in good faith once the issue of the defendant's state of mind or mental capacity has been placed squarely before the jury by the defense." In rejecting the request to bar Dr. Faerstein's testimony, it reasoned: "The doctor did testify that he advised the defendant that there was no privilege attaching. I don't see that any further qualification is required."

Defendant's reliance on *Estelle* v. *Smith, supra,* 451 U.S. 454, is misplaced. The United States Supreme Court recently explained that *Smith* does not apply to a situation such as the present where the defendant had requested a psychiatric examination through his Penal Code section 1026 plea and had presented psychiatric evidence at the penalty phase. (*Buchanan* v. *Kentucky* (1987) 483 U.S. 402 [97 L.Ed.2d 336, 354-357, 107 S.Ct. 2906].) ▆▆ *Buchanan* squarely held that when a defendant initiates a psychiatric examination by court-appointed experts or presents psychiatric evidence, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant had requested. There is no Fifth or Sixth Amendment violation under such circumstances. (*Ibid.*; accord *People* v. *Williams* (1988) 44 Cal.3d 883, 961-962 [245 Cal.Rptr. 336, 751 P.2d 395].)

2. *Other Crimes Evidence.*

Defendant contends that "other crimes" evidence was improperly admitted concerning his stabbing of a boy in high school, a threat he made to stab

his stepfather, the rape of Alice H., his throwing of a chair through a window while in Patton State Hospital, and the forcible sodomizing of a fellow inmate at Patton State Hospital in 1979.

He first argues that the superior court file relating to the Alice H. rape was inadmissible under Penal Code section 190.3 (hereafter section 190.3)—"evidence of prior criminal activity [shall not] be admitted for an offense for which the defendant was prosecuted and acquitted"—on the ground that it contained evidence of an offense of which he claims he was impliedly acquitted, i.e., assaulting Alice H. with the intent to commit murder.

It is, of course, "the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) Here, defense counsel made no objection. In reliance on *People* v. *Frank* (1985) 38 Cal.3d 711, 729, footnote 3 [214 Cal.Rptr. 801, 700 P.2d 415], defendant asserts that the rule is not applicable here: "On an appeal from a judgment imposing the penalty of death, a technical insufficiency in the form of an objection will be disregarded and the entire record will be examined to determine if a miscarriage of justice resulted." Here, however, there was not a "technical insufficiency in the form of an objection"; there was no objection at all.

Defendant next argues that the testimony of Alice H. was inadmissible. Specifically, he urges that in view of the fact that the superior court file had already been introduced, Alice H.'s testimony was inadmissible in its entirety under Evidence Code section 352 as cumulative and more prejudicial than probative. He also maintains that her testimony supporting the offense of assault with intent to commit murder was independently inadmissible under section 190.3. Again, the argument fails for lack of an objection and on the merits as well. Under the statutory scheme, the fact that defendant was previously convicted of the crime cannot limit the prosecution's ability to present testimony regarding that violent criminal activity. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301].) Alice H.'s testimony supporting the offense of intent to commit murder was admissible as part of the circumstances of defendant's commission of the rape.

Defendant also argues that the evidence of the high school stabbing, the threat to his stepfather, and the chair-throwing incident was inadmissible. Specifically, he maintains that such evidence could not properly be received on the ground that the prosecution failed to give him notice pursuant to

section 190.3. That provision states in relevant part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation." Defendant also urges that under *People* v. *Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782], the chair-throwing incident was inadmissible as not involving violent injury or the threat of violent injury to a person.

Defendant's argument fails on the merits. He may not complain about the chair-throwing incident, because the evidence was introduced by defense counsel. As to the two other items, the prosecutor introduced the high school stabbing and the threat to the stepfather on cross-examination of defendant's mother for impeachment of her testimony that defendant never caused her any problems and that he got along very well with his stepfather. Since the prosecutor could properly have introduced this evidence in rebuttal (Pen. Code, § 190.3), he could properly introduce it on cross-examination.

Again, however, the argument should be rejected at the threshold for lack of objection at trial to the introduction of the evidence at issue.

Defendant finally argues that the evidence of the high school stabbing, the threat to his stepfather, the chair-throwing incident, and the forcible sodomy at Patton State Hospital constituted inadmissible hearsay if offered to prove the truth of the matters asserted, and hence that such evidence should have been admitted, if at all, only for some proper nonsubstantive purpose. As to the chair-throwing incident, as explained above, and the forcible sodomy defendant may not complain: defense counsel introduced and used these matters to show the severity of defendant's mental illness. In any event, this argument also fails for lack of a specific and timely objection on the ground now urged. (*People* v. *Rogers, supra,* 21 Cal.3d at p. 548.)

3. *Sua Sponte Limiting Instruction.*

▮▮ Defendant contends that in violation of *In re Spencer* (1965) 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33], and *People* v. *Quicke* (1969) 71 Cal.2d 502 [78 Cal.Rptr. 683, 455 P.2d 787], the court (1) failed to limit, sua sponte, the admissibility of a certain statement he had made to Dr. Sharma solely for the purpose of showing the information on which the psychiatrist based his opinion, and (2) failed to instruct the jury, sua sponte, that it could consider the statement only for that purpose.

The statement at issue appears in the prosecutor's cross-examination of defense psychiatrist John Stalberg. The relevant portion of that cross-examination is as follows:

"Q. On page four of this report at the bottom, did you read when Dr. Sharma says: 'When examined on August the 18th '81 (third interview) the defendant told me that he killed the victim because, "God told me to do it. *I have killed many other people in the past.*" When asked to give details about past killings, the defendant smiled and said, "I am not a fool." ' [¶] Do you think that perhaps Mr. Poggi is lying when he says things like that?

"A. I don't think he killed anybody other than this victim, so I believe he's lying, yes, or was lying." (Italics added.)

In *People* v. *Quicke, supra,* 71 Cal.2d at pages 518-519, we stated as follows: "[I]n *In re Spencer, supra,* 63 Cal.2d 400[,] . . . we described the nature of the defendant's constitutional right to counsel in the instance of an examination of defendant by a court-appointed psychiatrist. We held that 'the presence of counsel at the psychiatric examination is not constitutionally required so long as certain safeguards are afforded to defendant.' [Citation.] We summarized these safeguards in *People* v. *Anderson* (1965) 63 Cal.2d 351, 367: '. . . the court-appointed psychiatrists should not be permitted to repeat the defendant's statements at the guilt trial unless the defendant specifically placed his mental condition into issue. Moreover, the trial judge should instruct the jury that the psychiatrist's testimony at the guilt trial which disclosed defendant's statements should be considered only for the purpose of exposing the information upon which the psychiatrist based his opinion and not as evidence of the truth of the statements.' [¶] These safeguards are as essential at the penalty trial as at the guilt trial. [Citation.] A defendant might well give to a court-appointed psychiatrist detrimental statements as to his past history and habits which the jury would weigh in determining whether or not defendant were fit to live."

The court did not err in failing to limit the admissibility of the statement, "I have killed many people in the past," and in failing to instruct the jury accordingly. Defense counsel made no request to limit the testimony at the time it was offered and made no tender of the instruction defendant now claims should have been given. Under such circumstances, the court was under no duty to limit the admissibility of evidence or to instruct the jury thereon. (*People* v. *Cantrell* (1973) 8 Cal.3d 672, 683 [105 Cal.Rptr. 792, 504 P.2d 1256].)[1]

---

[1] Defendant argues that *Cantrell* should not control because its facts are different: the statement in question there was elicited by defense counsel, not the prosecutor, at a trial of guilt, not the penalty phase of a capital case. We are not persuaded: the rule is broadly stated and

Defendant also contends that the court violated the *Spencer-Quicke* (*supra,* 63 Cal.2d 400; *supra,* 71 Cal.2d 502) rule by failing to limit, sua sponte, the admissibility of the evidence of the high school stabbing, the threat to his stepfather, the chair-throwing incident, and the forcible sodomy solely to some proper nonsubstantive purpose, and by failing to instruct the jury, sua sponte, that it could consider that evidence only for such purpose. We disagree.

The *Spencer-Quicke* rule is inapplicable. That rule, as explained above, covers testimony disclosing a defendant's statements to a court-appointed psychiatrist in the course of an examination. It is intended to allow the psychiatrist to examine the defendant outside the presence of counsel while safeguarding those interests of the defendant that the right to counsel is designed to protect. (*People* v. *Quicke, supra,* 71 Cal.2d at pp. 518-519; *In re Spencer, supra,* 63 Cal.2d at pp. 409-413.) The evidence here, however, does not derive from statements defendant made to a court-appointed psychiatrist in the course of an examination, and in no way implicates the right to counsel.

Even if the *Spencer-Quicke* rule were applicable, there was no error here. Defense counsel made no request to limit the testimony at the time it was offered and made no tender of the instruction defendant now claims should have been given. Under such circumstances, as concluded above, the court was under no obligation to limit or instruct sua sponte.

### 4. *Prosecutorial Misconduct.*

Defendant contends that the prosecutor engaged in prejudicial misconduct on several occasions during his closing argument.

Defendant first complains of the opening of the prosecutor's argument. The prosecutor stated as follows.

"It is at this time that it becomes my duty to ask you to render a verdict of death for the defendant. I know that as far as you are concerned this is not a welcome decision that you will have, but it is a just decision which you must render, and one that must of necessity be made when one considers Mr. Poggi, the life he has led and the crimes that he has committed. There really is no redeeming quality that we can find in Mr. Poggi or in his life.

"I know some of you may be thinking in effect, . . . what, what sense is it to render a death verdict on Mr. Poggi since we all know that it has been

---

broadly applicable, and provides no principled basis on which to limit its scope as defendant now urges.

years that anyone has been executed in the state of California and the likelihood is no one ever will. Well, to that I answer 'that is not your concern.'

*"What is important here is that in this country there is a swell of grass-roots anger at the system which in effect does not protect us from men like this. It is just as strong and inexorable as the civil rights movement was in 1960. It cannot be stemmed. The people must be heard."* (Italics added.)

Defendant argues that in making the italicized comment the prosecutor was attempting to inflame the passions of the jury and to persuade it to return a verdict of death "to vindicate 'grass-roots anger' against the criminal justice system." Even if the comment were inappropriate, it was not prejudicial.

 Under the rule of *People* v. *Green, supra,* 27 Cal.3d 1, 27-34, to preserve such a point misconduct must be assigned as error at trial with a request that the jury be instructed to disregard its effect. Simply to object or make an assignment of misconduct without seeking a curative admonition is not enough. "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.'" (*People* v. *Green, supra,* at p. 27.) Here defense counsel failed to object at trial to the comment of which defendant now complains. Thus, the point does not survive for purpose of review.

Defendant argues that the exception to the *Green* rule is applicable here—i.e., an appellate court may nevertheless reach the merits of the complaint if a timely assignment of misconduct and request for admonition would not have cured the harm. (*People* v. *Green, supra,* 27 Cal.3d at p. 34.) Contrary to defendant's assertion, the exception is not applicable on this record: defendant has simply failed to show that any harm threatened by the comment in question was incurable.

Defendant argues that the *Green* rule should not apply to the penalty phase of a capital trial. We rejected such a claim in *People* v. *Miranda* (1987) 44 Cal.3d 57, 108, footnote 30 [241 Cal.Rptr. 594, 744 P.2d 1127].

Defendant then argues that the comment in question was so inappropriate that the court should have intervened sua sponte, and that its failure to do so amounted to prejudicial error. We do not agree. The authority upon which he relies for the court's duty to intervene sua sponte, *People* v. *Perez* (1962) 58 Cal.2d 229, 250 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], is no longer valid in light of our rejection of its legal underpinnings

(i.e., the "close case" exception) in *People* v. *Green, supra,* 27 Cal.3d at pages 27-34.

Defendant next complains of the following comment in the prosecutor's argument: "By what right can you come before 12 people and say that to them and ask for their sympathy and pity when you have none, when you never had any for anybody, not even for your family, for no one, Mr. Poggi."

■ Defendant argues that in making the comment in question the prosecutor effectively told the jurors they were obligated to ignore whatever sympathy they might feel for him and in spite of such sympathy return a verdict of death. We do not agree. The prosecutor merely argued—as was his right—that in view of defendant's crimes the jurors should not show sympathy and spare his life, *not* that they were obligated to ignore whatever sympathy they might feel.

Defendant also argues that the prosecutor's statement that he had sympathy and pity for no one, "not even for your family," was in conflict with the testimony of his mother. He is correct. We fail to see, however, how this statement could realistically have subjected him to prejudice. In any event, the point is not preserved for appeal: defense counsel made no objection; whatever harm the statement threatened was not incurable; nor was the statement so offensive as to require the trial court to intervene.

■ Defendant also complains of the following comment in the prosecutor's argument: "Can you in good conscience say that if you sent him to life without possibility of parole, that you have put the cap on Mr. Poggi forever? No. For God knows what may happen in the future. Some Supreme Court decision may come down saying that leaving someone in jail without possibility of parole is a cruel and unjust punishment and these people must be given a parole date."

Defendant argues that the comment in question was improper because it invited the jury to consider speculative and impermissible factors in reaching its penalty decision. We agree. (Cf. *People* v. *Ramos* (1984) 37 Cal.3d 136, 155-159 [207 Cal.Rptr. 800, 689 P.2d 430].)

Prejudice, however, does not appear. Defense counsel objected to the prosecutor's comment; the court sustained the objection and instructed the jury to ignore the statement. On the facts of this case we believe that this instruction was a sufficient curative: the comment was brief and the instruction firm. Defendant presents no reason to arrive at a different conclusion.

Defendant next complains of the following comments in the prosecutor's argument: "There's going to be a lot of male prisoners [in prison]. [Defense counsel] says, 'Well, Mr. Poggi is going to be among rough people.' There is nobody rougher than Mr. Poggi. There's nobody quicker with a knife than Mr. Poggi. So, Mr. Poggi will be, I'm sure, not be the rapee up there. He'll be jeopardizing a lot of inmates out there. That's another thing you'll have to consider;" and, "The guy is a maniac. The guy is a danger. [¶] I am glad [defense counsel] said, 'Enough is enough.' That is what we must tell Mr. Poggi. Enough is enough, Mr. Poggi. Enough is enough. Possibly you may not do your things out in Cudahy or somewhere else, but what we know about you you will be doing those things up in prison, too. [¶] Do we have a responsibility to those other prisoners who may or may not deserve Mr. Poggi?"

■■■ Defendant argues that in making the comments quoted above the prosecutor engaged in prejudicial misconduct in violation of the principles of *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767-774 [175 Cal.Rptr. 738, 631 P.2d 446]. We disagree. We recently held that a prosecutor's comments on a defendant's future dangerousness are within the proper bounds of argument to the jury. (*People* v. *Miranda, supra,* 44 Cal.3d at p. 111; *People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].) We distinguished *Murtishaw, supra,* 29 Cal.3d 733, where expert opinion regarding predictions of future violence was held to be inadmissible at the penalty phase. There our primary concern was that expert opinion on a defendant's propensity to commit violence is unreliable, frequently erroneous, and often carries great weight with the jury. A prosecutor's comments during closing arguments do not present the same potential for prejudice.

Defendant also argues that the prosecutor's remarks about his "roughness" and "quickness with a knife" were improper as without support in the record. Again, however, it is difficult to conclude that these brief and insignificant remarks were prejudicial. Moreover, the point is not preserved for appeal. Defense counsel made no objection; whatever harm the comments threatened was not incurable; nor were the comments so offensive as to require the trial court to intervene.

Defendant also complains that the prosecutor erroneously stated that "Mr. Poggi killed and raped, not once but two more times." When, however, we consider this statement in context, we see that no misconduct occurred.

"[The prosecutor:] And what happened was that Mr. Poggi killed and raped, not once but two more times. The question —

"[Defense counsel:] Objection, Your Honor.

"The Court: Sustained.

"[Defense counsel:] There's no evidence of that.

"The Court: There is no evidence that he killed two more times.

"[The prosecutor:] I'm sorry. I meant he raped two more times. He killed one, he raped twice, a total of three times."

Thus, it is evident that in erroneously stating that defendant had "killed and raped, not once but two more times," the prosecutor merely misspoke and then corrected himself. Defendant argues that although the court sustained defense counsel's objection, it did not strike the prosecutor's misstatement or direct the jury to ignore it, and therefore did not take adequate steps to cure the harm. Defendant's argument is wide of the mark: the prosecutor misspoke, he did not engage in misconduct; any "harm" threatened by the misstatement was prevented by the prosecutor's apology, and accordingly stood in no need of cure on the part of the court.

Defendant next complains of the following comment in the prosecutor's argument.

"Life without possibility of parole, let's talk about that. Mr. Poggi will receive visits from his mother, whoever he wants to visit. He will receive Christmas packages. He will see Christmas, as many Christmases as he wants, Thanksgiving. He'll even have parties. The Christmases that [Patricia Musgrove's parents] will have will not be like the Christmases you will have. Every Christmas will be an anniversary of their daughter's death. Every Christmas will be a reminder to Mrs. Musgrove's little child that he has no mother. Every Christmas, I think, also will be a reminder on your part, wherever you may go—you'll all scatter—that somewhere, maybe while you are having your drinks somewhere, you'll think of Mrs. Musgrove and her family. And Christmas will never be the same to her. But Mr. Poggi will have his nice Christmases. Oh, not as pleasant, possibly as some other people, but he'll have his Christmases.

"Conjugal—there's even some talk about—I mean there's a movement about allowing prisoners to have conjugal visits. That means sex in prison. There's even talk about letting—you know, letting not only the husband or the wives, but girl friends. Oh, there's even a possibility that Mr. Poggi will have some sex while he's in prison, at the expense of the state.

"Oh, Mr. Poggi, life without possibility of parole is not such a bad deal. And this is what Mr. Poggi wants you to give him."

Defendant argues that the prosecutor's comment amounted to misconduct because it was plainly intended to inflame the passions of the jury. ■■■ The comments about the effect of the killing on the victim's family were arguably inappropriate under *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], which bars admission of victims' impact statements at the penalty phase of capital cases. In contrast to *Booth,* the comments here were brief and referred only to the obvious impact of a death in the family. They were clearly harmless beyond a reasonable doubt. (See *People* v. *Miranda, supra,* 44 Cal.3d at pp. 112-113; *People* v. *Ghent* (1987) 43 Cal.3d 739, 771-772 [239 Cal.Rptr. 82, 739 P.2d 1250].)

Defendant then complains of the prosecutor's remarks that he was "evil" and "an evil spirit in a bottle." He also objects to the following statement which the prosecutor made as he commented on a photograph of defendant as a child: "I saw a photograph of Adolph Hitler when he was a child. He was a darling little boy, a darling little boy. You would never think looking at that photograph that Adolph Hitler would turn out to be the way he turned out to be. All little boys are darling creatures. They don't show themselves."

Defendant argues that the prosecutor engaged in misconduct by intentionally characterizing him in such a way as to inflame the passions of the jury. On the facts of this case, however, we cannot conclude that the comments in question subjected defendant to prejudice. In any event, the point is not preserved for appeal: defense counsel made no objection; the harm the comments threatened was not incurable.

Defendant complains of the ending of the prosecutor's argument. The relevant portion is as follows: "Ladies and gentlemen of the jury, you will render a verdict and I think it will be a just one. It cannot be anything but that, because Mr. Poggi has shown us in the brief glimpse we have had of his life that there is nothing redeemable, again I mention, about Mr. Poggi.

"He has led a life of violence not related to any mental defect or disorder he has.

"While you render a verdict of death on Mr. Poggi, that's not the worst thing that is going to happen to Mr. Poggi, because there will be another trial, another trial in which Mr. Poggi will have to answer to someone more important than we all at this trial.

"Mr. Poggi will face Patricia Musgrove and he will have to answer to Patricia Musgrove. After that trial, and that is the trial that is the trial that

is important, not this one, because we all live in this sort of temporary life. Some of us leave sooner than others. We all cannot stay here.

"The trial I refer to is the trial in which Mr. Poggi will have to explain to someone higher than us as to why he killed Patricia Musgrove and why he raped [Alice H.]. There will be Mrs. Musgrove there to testify, not in the bloody mess which he left her but in the way she was when Mr. Musgrove married her and the way she was in that picture that you saw.

"There will be [B. V.], not in the way that you saw her trembling and unable to testify but a Mrs. [B. V.] in the way she was before she met Mr. Poggi: Strong in her determination and in her will to tell the truth. After that trial Mr. Poggi will be sentenced to eternal damnation and hell."

 Defendant complains that in making the comment in question the prosecutor attempted improperly to play on the jurors' religious sentiments to his prejudice and also sought to diminish their sense of responsibility for the penalty determination in violation of *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]. Although we do not believe that the comment reveals an intent to diminish the jurors' sense of responsibility, we do agree that its reference to another trial and another judge was inappropriate. We conclude, however, that it was not prejudicial on the facts of this case: coming as it did at the very close of the prosecutor's argument, the comment would have been recognized by the jurors as an advocate's hyperbole and would accordingly have been discounted. In any event, the point is not preserved for appeal: defense counsel made no objection at trial; any harm the comment threatened was not incurable; nor was the comment so offensive as to require the trial court to intervene.

### 5. *Excessive Special Circumstances.*

 In reliance on *People* v. *Harris* (1984) 36 Cal.3d 36, 66 [201 Cal.Rptr. 782, 679 P.2d 433], defendant contends that the special circumstance findings were rooted in an "indivisible course of conduct" and therefore "should be considered as one," and hence that the court erred in failing to so instruct the jury. We disagree. We recently rejected a virtually identical claim in *People* v. *Melton* (1988) 44 Cal.3d 713, 765-768 [244 Cal.Rptr. 867, 750 P.2d 741].

### 6. *Instructions.*

Defendant contends that the court committed prejudicial error by failing to instruct the jury, sua sponte, not to consider evidence of the offense for

which he claims he was prosecuted and acquitted, i.e., assaulting Alice H. with intent to commit murder. The point lacks merit.

The court had no obligation to deliver such an instruction sua sponte, but in any event, defendant suffered no prejudice as a result of the court's failure to do so. The evidence of which he specifically complains is Alice H.'s testimony that in the course of the rape he repeatedly said, "I gotta kill you," and attempted to strangle and smother her. That evidence, however, was independently admissible insofar as it relates to rape—an offense of which, of course, he *was* convicted. Thus, no prejudice appears.

Defendant contends that the court prejudicially erred by failing to instruct the jury, sua sponte, that it could not properly consider the "other crimes" evidence in aggravation unless it first found that the prosecution had proved such crimes beyond a reasonable doubt. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279].) We disagree.

The high school stabbing, the threat to his stepfather, the chair-throwing incident, and the forcible sodomy were not introduced or used by the prosecution as "other crimes" evidence in aggravation and thus no instruction was required. (See *People* v. *Williams, supra,* 44 Cal.3d at pp. 958-959.) Specifically, as explained above, the two former matters were introduced and used by the prosecution to impeach the testimony of defendant's mother that defendant never caused her any problems and got along very well with his stepfather; the two latter matters were introduced and used by defense counsel to show the severity of defendant's mental illness.

 As to the Alice H. rape, no *Robertson* instruction was required because the record of defendant's conviction of that offense had already been introduced. The *Robertson* instruction is unnecessary under such circumstances. (See *People* v. *Robertson, supra,* 33 Cal.3d at p. 60 [Broussard, J. conc. opn.].)

 Defendant next contends that the court erred by failing to instruct the jury, in conformity with Penal Code section 190.3, factor (h) (hereafter section 190.3(h)), that they were obligated to consider "Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects [*sic*] of intoxication."

His claim fails at the outset. It was at defense counsel's insistence that the court refrained from giving the instruction in question. Defendant, however, relies on *People* v. *Graham* (1969) 71 Cal.2d 303 [78 Cal.Rptr. 217,

455 P.2d 153] and *People* v. *Wickersham* (1982) 32 Cal.3d 307 [185 Cal.Rptr. 436, 650 P.2d 311] to argue that counsel's action should not be deemed invited error because counsel objected to the instruction not for tactical purposes but out of mistake or neglect.

We do not agree. The following colloquy is pertinent here.

"[Defense counsel:] . . . [The prosecutor] has raised subsection (h) of 190.3, and I have previously, in chambers, told the court that I was dissatisfied with the court giving that instruction, inasmuch as it does parrot the language of the *Drew* insanity decision [*People* v. *Drew* (1978) 22 Cal.3d 333 (149 Cal.Rptr. 275, 583 P.2d 1318)]. And in this case we are not contending that Mr. Poggi is insane. So, that has no purpose of being used as a straw man for the prosecution to knock down by bringing in witnesses to say he wasn't insane.

"We're not contending he was insane. And by giving (h) to the jury, as a possible mitigating factor, the court is giving a free shot to the prosecution to say that, look, there is no mitigating evidence on that, when we're not contending an issue.

"The court, in an abundance of caution, and I realize the dilemmas these arguments put the court in, told counsel yesterday that it was going to give (h) solely because someone might content [*sic*] that somewhere in the record he was legally insane at the time of the offense. But none of the evidence that the defense has presented has argued that . . . .

"[The prosecutor:] Your Honor —

"The Court: Before hearing again from [the prosecutor], with reference to 190.3, subdivision (h), I grant you the language used is the same language involved in the test of the insanity—or the insanity definition, but you did say yesterday in the chambers conference concerning jury instructions, which was off the record, and you have asserted today on the record, that you are objecting to that instruction being given. Since the issue has been raised, perhaps this is an appropriate time to address it.

"That section refers to the jury's right to consider, quote 'whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affection of intoxication.' Now, that talks about impairment.

"Is it your contention, [defense counsel], that the court in not giving that instruction should preclude the jury from considering any aspect of your

client's mental condition or impairment, when that has been the whole thurst [*sic*] of the defense in the penalty phase?

"`. . . . . . . . . . . . . . . . . .`

"[The prosecutor:] Subdivision (d), your Honor.

"[Defense counsel:] Since that adequately instructs the jury on the mitigating factors that they need to evaluate in this case, there's no reason to give (h). It's redundant and in this case it's confusing to the jury.

"The Court: All right.

"[Defense counsel:] Unnecessarily.

"The Court: As far as (h) is concerned, on that point alone do you wish to be heard?

"[The prosecutor:] Well, your Honor, before I answer the question on that (h), even (d) allows the people to present evidence as to whether he acted under the influence of extreme mental or emotional disturbance.

"`. . . . . . . . . . . . . . . . . .`

"And certainly, your Honor, I would—I would acquiesce to [defense counsel's] request that (h) not be given, on the basis that we should not give more fodder to the Supreme Court in reversing convictions of this sort. Whether or not we're correct, I'll leave to perhaps some other Supreme Court at some other time. But I expect that this—if this instruction were given it would be reversed.

"The Court: All right. I had anticipated that (h) was essentially a favorable instruction to the defense. But in view of the statements made on the record, the court will not give the instruction pertaining to 190.3 subparagraph (h)."

On the face of the record it seems plain that defense counsel "express[ed] a deliberate tactical purpose in objecting to . . . [the] instruction . . . ." (*People* v. *Wickersham, supra,* 32 Cal.3d at p. 333.) Defendant argues, in substance, that counsel mistakenly assumed that section 190.3(h) was no broader than the then-applicable insanity test stated in *People* v. *Drew* (1978) 22 Cal.3d 333, 339-348 [149 Cal.Rptr. 275, 583 P.2d 1318], and that his mistake vitiated the legal effect of his objection. We are not persuaded.

It appears to be true that at the beginning of the colloquy defense counsel labored under the mistaken assumption that section 190.3(h) was no broader than the *Drew* test. The court, however, proceeded to correct counsel's misunderstanding. After the court's correction, counsel continued to insist that the court not instruct in conformity with the provision on the ground that "It's redundant and in this case it's confusing to the jury." His reason for doing so is not hard to understand: he was attempting to show that defendant was suffering from "extreme mental or emotional disturbance" at the time of the killing, not simply that his "capacity" was "impaired."

### 7. *Penal Code Section 190.3, Factor (d).*

■■■ Defendant contends that Penal Code section 190.3, factor (d) (hereafter section 190.3(d)) is unconstitutional on its face. That provision defines as one of the factors to be considered in determining penalty "Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Defendant argues that extreme mental or emotional disturbance is properly a factor in mitigation, but that section 190.3(d) impermissibly authorizes the trier of fact to consider it as a factor in aggravation. We are not persuaded: it seems plain that the provision does not authorize the jury to consider the presence of extreme mental or emotional disturbance in aggravation (cf. *People* v. *Jackson* (1980) 28 Cal.3d 264, 316 [168 Cal.Rptr. 603, 618 P.2d 149] (plur. opn.) [reasoning that it was "quite obvious" that former Pen. Code, § 190.3, factor (g), dealing with diminished capacity, authorized the trier of fact to consider the presence of diminished capacity in mitigation but not in aggravation].)

Defendant also contends that on the facts of this case the instruction incorporating section 190.3(d) may have led the jury to believe that the presence of extreme mental or emotional distress should be considered in aggravation. We do not agree.

The instruction, considered by itself, would not have misled a reasonable juror. Moreover, if the instruction is considered within the context of the penalty phase as a whole, the conclusion is the same. First, there was no other instruction that could have caused the instruction in question to have been understood other than in its proper sense. Second, the testimony of the prosecution and defense experts could not have affected a reasonable juror's understanding of the instruction to defendant's prejudice: the point at issue was whether defendant's undisputed mental illness substantially caused the murder and thereby diminished his culpability. Third, defense counsel's argument made it clear that the presence of extreme mental or emotional distress went to mitigation. It is true that the prosecutor, in his closing

argument, at times linked defendant's violence and mental illness in a troubling manner. Nevertheless, taken as a whole, the argument could not reasonably have had a misleading effect: its theme, in the prosecutor's words, was that "[defendant] has led a life of violence not related to any mental defect or disorder he has."

8. *Section 190.3 Sentencing Formula.*

Defendant contends that the mandatory sentencing formula of section 190.3 is unconstitutional on the ground that it withdraws constitutionally compelled sentencing discretion from the jury. In *People* v. *Brown, supra,* 40 Cal.3d 512, 538-544, however, we rejected that very contention. Defendant presents us with no compelling reason to reconsider our holding.

Defendant further contends that on the facts of this case the instruction embodying the mandatory sentencing formula of section 190.3 may have misled the jury to his prejudice about the scope of its sentencing discretion and responsibility under the 1978 death penalty law.

Although we held in *Brown* that the mandatory sentencing formula was not unconstitutional in itself (40 Cal.3d at pp. 538-544), we nevertheless recognized that when delivered in an instruction the statutory language might mislead the jury as to the scope of its sentencing discretion and responsibility (*id.* at p. 544, fn. 17). For this reason we directed trial courts thereafter to instruct juries in conformity with the principles set forth in *Brown,* rather than in the bare words of the statute. (*Ibid.*) With respect to cases in which the jury had been instructed in the statutory language, we announced that we would examine each such appeal on its merits to determine whether the jury may have been misled to the defendant's prejudice. (*Ibid.*)

Defendant argues that certain comments in the prosecutor's closing argument and the court's response to the jury's request for a definition of the phrases "aggravating circumstances" and "mitigating circumstances" may have led the jury to entertain an erroneous belief as to the scope of its sentencing discretion and responsibility. We do not agree. The comments cited by defendant—which are all quoted above in the discussion of the prosecutorial-misconduct contention—merely present the case in aggravation as overwhelming and the case in mitigation as insubstantial, and do not go to the "mandatoriness" of the death penalty law at all. Similarly, the court's response to the jury's request—"To aggravate means to make worse. To mitigate means to make less severe"—does not go to the issue of "mandatoriness."

9. *Factor (k).*

 Defendant contends that Penal Code section 190.3, factor (k) (hereafter section 190.3(k))—which directs the jury to consider, among other enumerated factors, "[a]ny other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime"— limits the jury's sentencing discretion and responsibility in violation of the federal Constitution as construed in *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954], and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869], in which the high court held that a sentencer may not be precluded from considering as a mitigating factor any aspect of a defendant's character or record that the defendant proffers as a basis for a sentence less than death. In *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], we impliedly upheld the constitutionality of the statutory provision. Defendant presents us with neither argument nor authority that compels us to depart from our holding.

Defendant also contends that on the facts of this case the jury may have been misled to his prejudice about the scope of their sentencing discretion and responsibility by the language of factor (k) of former CALJIC No. 8.84.1 (hereafter former factor (k)), which incorporates the language of section 190.3(k).

Although we impliedly held in *Easley* that section 190.3(k) was not unconstitutional in itself (34 Cal.3d at pp. 877-878), we nevertheless recognized that when delivered in an instruction the statutory language might mislead the jury as to the scope of its sentencing discretion and responsibility under the federal Constitution as construed in *Lockett, supra,* 438 U.S. 586, and *Eddings, supra,* 455 U.S. 104 (34 Cal.3d at p. 878). For this reason we directed trial courts thereafter to inform the jury that they may consider in mitigation not only factor (k) but also "any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" (*Id.,* at p. 878, fn. 10.)

In *Brown* we announced that as to cases in which the jury had been instructed pursuant to former factor (k), we would examine each such appeal on its merits to determine whether the jury may have been misled to the defendant's prejudice. (40 Cal.3d at p. 544, fn. 17.) In conducting such an examination, we look to " 'the totality of the penalty instructions given and the nature of the arguments made to the jury' . . . ." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 786 [230 Cal.Rptr. 667, 726 P.2d 113].)

Defendant argues that the instructions and the arguments of counsel may have led the jurors to entertain the erroneous belief that they could not

properly consider in mitigation evidence of his mental illness short of "extreme mental or emotional disturbance." We are not persuaded.

The instructions that the court gave were plainly not misleading as a whole. Defendant does not dispute the point. Rather, he claims that the court's failure to instruct in accordance with section 190.3(h) may have led the jury to erroneously believe that they could not consider in mitigation evidence of his mental illness short of "extreme mental or emotional disturbance." We find it difficult to conceive how an instruction *not given* could lead the jury to understand former factor (k) in an improper sense. In any event, for the reasons stated above defendant is barred by the doctrine of invited error from complaining about the failure to instruct on section 190.3(h).

10. *Ineffectiveness of Counsel.*

Defendant contends that he was denied the effective assistance of counsel at the penalty phase. Specifically, he complains of the following: (1) defense counsel's request that the court not instruct in conformity with Penal Code section 190.3(h); (2) his failure to object to the admission of the superior court file relating to the Alice H. rape; (3) his failure to object to Alice H.'s testimony at the penalty phase; (4) his failure to object to the statement in Dr. Sharma's report, "I have killed many other people in the past"; and (5) his failure to make practically any objections to the prosecutor's closing argument.

To establish entitlement to relief for ineffective assistance of counsel defendant must show (1) that trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) There are some cases in which the record on appeal "sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal." (*People* v. *Pope, supra,* 23 Cal.3d at p. 426.)

As noted above in our discussion of defendant's contentions regarding penalty phase instructions, defense counsel expressed a valid tactical purpose for his request that the court not instruct in conformity with section 190.3, factor (h) and in so doing demonstrated reasonable competence and diligence. With this one exception, however, the appellate record sheds no light on why counsel conducted the penalty phase as he did. He was not asked to explain his performance, and we cannot conclude that there could

be no satisfactory explanation. Moreover, as to defendant's complaint regarding failure to object to the testimony of Alice H., we have already concluded that the evidence was properly admitted. Thus, an objection would have been futile.

11. *Cruel or Unusual Punishment.*

■■■ Relying on *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921] and *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], defendant argues that the death penalty in his case constitutes cruel or unusual punishment under article I, section 17 of the California Constitution. He contends that the sentence is disproportionate to his culpability because of his organic brain damage, history of mental illness, and chronic schizophrenia. We disagree.

Although it is true that defendant had suffered organic brain damage, had a history of mental illness, was schizophrenic, and mentally ill on the day of the murder, those factors do not sufficiently reduce his culpability to make the sentence disproportionate. Dr. Stalberg, a defense psychiatrist, testified that "his mental illness was not of such a nature and degree . . . as to negate or diminish his criminal culpability."

Defendant acted as he did evidently to eliminate a witness and thereby avoid apprehension. He was unspeakably brutal. He was the sole and actual perpetrator, and he killed an innocent young woman.[2]

12. *Proportionality.*

Defendant requests that we review the sentence of death in this case for proportionality. To the extent he bases his request on the requirements of the United States Constitution, he makes arguments that have already been considered and rejected. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 778.) To the extent he rests on the California Constitution, he fails to show that the state charter requires what the federal charter does not. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1285-1288 [232 Cal.Rptr. 849, 729 P.2d 115].)

The judgment is affirmed.

Lucas, C. J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

[2] Defendant claims, without independent argument, that the infliction of capital punishment would constitute cruel and unusual punishment under the federal Constitution. We are not persuaded. The point is predicated on the assumption that the state and federal guaranties are coterminous. Since, as explained above, he has failed to show that the death penalty would violate his right under the state Constitution, he has also failed to show that it would violate his right under the federal Constitution.

Broussard, J., concurred in the judgment only.

**MOSK, J.**—I concur in the affirmance of the judgment as to guilt and in the sustaining of the special circumstance findings.

I dissent, however, from the affirmance of the judgment as to penalty. I agree with the majority that the state may require defendant to pay, and pay dearly, for the murder of which he stands convicted. But as I shall explain, I cannot agree that the state may constitutionally require defendant to pay for the crime with his life. Accordingly, I would modify the judgment by reducing the penalty from death to life imprisonment without possibility of parole and would affirm the judgment as so modified.

The cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution prohibits the imposition of a penalty that is disproportionate to the defendant's "personal responsibility and moral guilt." (*Enmund* v. *Florida* (1982) 458 U.S. 782, 801 [73 L.Ed.2d 1140, 1154, 102 S.Ct. 3368]; see generally *Solem* v. *Helm* (1983) 463 U.S. 277, 284-295 [77 L.Ed.2d 637, 645-653, 103 S.Ct. 3001].) Article I, section 17 of the California Constitution separately and independently lays down the same prohibition. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 479-482 [194 Cal.Rptr. 390, 668 P.2d 697].)

In light of the evidence adduced at the penalty phase, I am compelled to conclude that the sentence of death is disproportionate to defendant's "personal responsibility and moral guilt." (*Enmund* v. *Florida, supra,* 458 U.S. at p. 801 [73 L.Ed.2d at p. 1154].) To be sure, the prosecution and defense experts disagreed on several points. But they were all in substantial agreement on the following matters: defendant had experienced significant and irreversible organic brain damage as a young child; he had a long and continuous history of mental illness; he suffered from a form of psychosis termed chronic schizophrenia; and he was in fact mentally ill on the very day of the murder. As the majority observes, defense psychiatrist John Stalberg did indeed agree with the opinion of prosecution psychiatrist Kaushal Sharma, to the effect that "[defendant's] mental illness was not of such a nature and degree to as to [*sic*] negate or diminish his criminal culpability" for purposes of the defense of insanity or diminished capacity. But Dr. Stalberg also testified—without contradiction—that "Mr. Poggi has the judgment and control of a 12 year old." On this record, I conclude that defendant cannot escape punishment for his act through any so-called "mental" defense. But I also conclude that his personal moral culpability is not sufficiently grave as to allow the state to inflict on him the ultimate sanction.

For the foregoing reasons, I would modify the judgment by reducing the penalty from death to life imprisonment without possibility of parole and would affirm the judgment as so modified. (See *People* v. *Frierson* (1979) 25 Cal.3d 142, 182-183 [158 Cal.Rptr. 281, 599 P.2d 587] (plur. opn.); see generally Pen. Code, §§ 1181, subd. 7, 1260.)

Appellant's petition for a rehearing was denied June 30, 1988, and the opinion was modified to read as printed above. Mosk, J., was of the opinion that the petition should be granted.