Filed 11/18/13  P. v. Howard CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>SEAN D. HOWARD,<br><br>     Defendant and Appellant. | B242518<br><br>(Los Angeles County<br>Super. Ct. No. BA387832) |

        APPEAL from a judgment of the Superior Court of Los Angeles County. Monica Bachner, Judge.  Affirmed.

        Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Sean Deondre Howard of three counts of kidnapping to commit robbery (Pen. Code, § 209, subd. (b)(1))[1] (counts 1-3), one count of second degree robbery (§ 211) (count 4), and two counts of attempted second degree robbery (§§ 664/211) (counts 5, 6). The trial court found that defendant had suffered two prior serious felony convictions (§§ 667, subd. (a)(1), 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and that he had served three prior prison terms (§ 667.5, subd. (b)).

The trial court sentenced defendant to state prison for a total term of 105 years to life. The sentence consisted of consecutive 25-year-to-life terms, and two 5-year section 667, subdivision (a)(1) enhancements on each of counts 1through 3.

Defendant appeals on the grounds that: (1) the trial court's exclusion of the 911 recording was legally erroneous and resulted in the denial of his constitutional rights to present a defense and to confront witnesses; (2) the trial court's denial of the new trial motion resulted in a miscarriage of justice and a denial of due process; (3) there was insufficient evidence of his prior federal conviction for armed bank robbery; (4) the $15,000 restitution fine was arbitrary and excessive and violated section 1204.4 and the Eighth Amendment.

## FACTS

**Prosecution Evidence**

On August 14, 2011, at approximately 9:00 p.m., Kiara M., who was 14 years old at the time of trial, was waiting at a bus stop at Crenshaw Boulevard and Martin Luther King Boulevard. Kiara was with her sister Kimberly and Abel Espinoza, who at the time was a "stepbrother" to the girls. Some young African-American men approached them and tried to start trouble with Abel. They also taunted Kiara about her figure. Another man seated on the bench, later identified as defendant, spoke up and told the harassing persons to calm down. Kiara, Kimberly, and Abel began to walk away from the bus stop. Defendant had a car parked nearby and he offered to take them home. Defendant opened

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

up the rear driver's side door, near to which Kiara was standing. One of the harassing men pushed her in the car, and it seemed the man wanted to get in the car also. Kiara was frightened. Defendant told him not to get in. Abel then got in the front passenger seat of the car and Kimberly got in the rear passenger seat behind him. Abel gave defendant the address where they lived.

Defendant got in the car and proceeded to drive around for 40 to 45 minutes. Music was playing, and Kiara liked the music. Defendant asked Abel to buy him a pack of cigarettes, and Abel agreed. Defendant stopped at a liquor store, and Kiara recalled that he and Abel went in and came out again after 10 minutes with cigarettes and liquor. Defendant started driving and asked Kiara and the others again where they lived. Abel told him. Kiara believed something was wrong and began to become frightened. Defendant kept telling the young people that they were safe.

After approximately 30 minutes, defendant stopped the car in a dark residential area. Defendant told the others to give him "all the stuff" that they had or he was going to shoot them. Kiara believed defendant had a gun. She had seen him grab a sweater as if there were something wrapped inside it and place it close to his lap when he returned to the car from the liquor store. The sweater had been at Kiara's feet on the rear floor of the car. Defendant checked Abel's pockets to see if Abel had anything. Defendant said Abel would not want to get shot just for a couple of dollars. Defendant used his right hand to check while he held the sweater with his left hand. Defendant took Abel's money and cell phone. The girls told defendant they had nothing. Kiara was scared. Defendant told them not to look at him. Kiara wanted to get out of the car. When Kiara removed her seat belt, defendant said, "Yeah, try to slide out and I'm going to end up shooting you."

When defendant was finished with Abel, he drove around for approximately 30 minutes. He then took his passengers to a location across from a McDonald's restaurant, where he told Kiara and Kimberly to get out. Everyone was quiet, and defendant still had the sweater in his lap. It was still dark outside. The girls got out of the car and went to the restaurant. Abel stayed behind. The girls could no longer see defendant's car because he was in a side road. The girls stayed in a corner of the restaurant and saw Abel

3

reappear after approximately 10 minutes. Abel was no longer wearing his shirt, which was bloody and torn, and he was bleeding from the mouth. Abel walked up to the drive-through window and asked someone to call the police. The three then began walking away, and Kiara did not know if the police arrived. As they walked along the street, the three young people found police approximately two blocks away "with someone else's case." They told the police what had happened.

On cross-examination, Kiara stated that she told the police everything that she had stated in her trial testimony, and she denied giving a different account. When shown a transcript of the preliminary hearing, she denied that she had said the young men harassing her had called her "vaca." She did not remember saying, or she denied saying, other things in her testimony that were read to her from the transcript. She testified on cross-examination that she and the others just happened to walk away from the bus stop in the same direction as defendant, and he was saying "Oh, it's cool. It's cool. Those crazy people." She could not remember how defendant asked them to enter his car. She denied that she told Abel or the people in the restaurant not to call the police.

Kimberly was 16 at the time of trial. She recalled that defendant came over to them while 10 to 15 Black boys were harassing them, and defendant told them he could help them. He said he could give them a ride home. Since they were scared, they trusted him and went with him to his car. She remembered there was a police car nearby, but none of them asked the police for help. Defendant's car doors were open, and he told them to get in. No one gave him the address at that time. One man who had been in the harassing group pushed Kiara into the car and then got in as well. Defendant, who was sitting in the driver's seat, told the man to get out, and he did so. Defendant told them to relax and that everything would be all right. Kimberly was scared because of the men at the bus stop, but she felt good because she thought defendant would help them. When defendant asked for their address, Abel gave him an approximate location. They stopped at a liquor store after 20 or 25 minutes. When defendant came back, he said he would take them home. They next stopped in a dark residential area for 30 minutes to an hour. That is when defendant changed and told them to give him their stuff. He reached down

4

in the back seat and slowly picked up a jacket and put it on his lap. It was supposedly a gun. He said to give him everything or he would shoot them. Abel had his hands up while defendant checked him.

Kimberly removed her seat belt and defendant said he would blow her brains out if she got out. Defendant then drove them near the McDonald's restaurant and they got out. It was about half an hour before Abel appeared at the restaurant. According to Kimberly, all three of them told the people at McDonald's to call the police. She said they waited for 10 minutes and then left when no police showed up. They went to a car wash because there were police there. Kimberly was certain that she did not tell the McDonald's employee not to call the police. Kimberly believed they were in defendant's car for two to three hours. On cross-examination, Kimberly confirmed each fact that she had related to either Officer Gan or Officer Slavinskiy, as recited to her by defense counsel.

Abel recalled that defendant approached them and told them "Don't worry" when the group of men was hassling him and his stepsisters. Defendant led them to his car. A patrol car approached, but defendant did not act nervous, and it appeared they could trust him. Abel said he got in the car only because Kiara had been pushed inside; he did not do so "willingly." Abel denied they listened to music in the car. Abel told defendant that they lived at Arlington Avenue and Martin Luther King Boulevard. When defendant began to drive in the opposite direction, Abel told him it was the other way. Defendant asked Abel "just to do him a favor" and buy him some cigarettes. As Abel waited to pay for his purchases, defendant said he needed to use the restroom, and he went toward it. Apparently, there was also an exit there. When Abel paid and walked out, he saw defendant jogging to the car. Defendant seemed surprised to see Abel. Defendant got in the car, and Abel did also. Abel did not feel he could pull Kiara and Kimberly out of the car right then, but he was feeling nervous.

Defendant drove them to a neighborhood of dark, small streets. Defendant was laughing and "acting like a nice person," and Abel felt confused. Defendant kept driving around the same streets and Abel kept asking him if he was going to drive them home. Defendant stopped the car, and he picked up a jacket from the back and put it in front

5

between Abel and him. Defendant pretended he had a gun. Defendant pointed it at Abel and Abel understood that they should give defendant all of their money. Abel had $240 in $20 bills in his right pocket, and defendant pulled it out. He took Abel's phone from his left front pocket.

After taking Abel's belongings and cash, defendant drove off, keeping his hand in the same position. Abel was afraid and did not feel he could leave. Defendant was still asking where to drop them off. They told him "someplace close to Crenshaw." When defendant stopped the car, he told them to get out. Abel told Kiara and Kimberly to get out of the car, but he stayed behind. Abel asked defendant to give him some money back. By that time, Abel was angry.

Defendant seemed nervous because Abel was not getting out of the car. He began to hand Abel a $20 bill, and Abel grabbed and pulled defendant's arm and hit him with his elbow. Abel started hitting defendant, and defendant tried to push him out of the car. They began fighting, and defendant started to drive. Abel closed the door and leaned against it and began kicking defendant in the face. Defendant began driving recklessly. Abel grabbed defendant by the neck and pressed on his neck. It seemed that defendant could not breathe, and he dropped Abel's money and told him to take it. Abel continued to put pressure on defendant's neck, and defendant bit Abel on the inside left forearm. Abel became angry and bit off part of defendant's right ear.

Defendant pulled into a parking lot and told Abel, "This is my neighborhood." Abel was afraid that there might be people whom defendant knew there, so he jumped out of the moving car. He ran back to where they had dropped off the girls. He had neither his phone nor his money. He saw the girls, and after finding out that they were okay, he went to the drive-through window and asked the manager to call 911. Because the employees acted as if they did not know what to do, Abel began walking toward some police lights he saw. He asked the police for help. Abel gave a description of defendant and his injury and, for the most part, told them the account to which he had testified. The next morning, police showed Abel a photographic lineup (six-pack). Abel circled defendant's photograph.

6

Abel sustained a bite injury and a split lip, as well as some scratches from jumping from the car. Abel's phone was returned, but he never received his money back.

At approximately 9:45 p.m., Officer Bronislav Slavinskiy of the Los Angeles Police Department responded to an incident unrelated to defendant's case. He saw Kiara, Kimberly, and Abel approach, and they looked scared. They described a suspect who was a male Black, tall, lean, and missing a piece of his right ear. Two other officers approached, one of whom was Officer Robert Smith.

Officer Smith testified that he saw two distraught females running towards him and asking for help. A Hispanic male joined them shortly thereafter. He recognized them from having seen them earlier at the bus stop at "Crenshaw and King" at approximately 8:37 p.m. He and his partner had gone there after receiving a call that there was an aggressive group, possibly with a gun, harassing people at the bus stop. As he approached the stop, several people began to walk away, and Officer Smith wished to engage them in a consensual encounter. Among them were Kiara and Kimberly, who were walking with two male Blacks and a male Hispanic to a vehicle. Officer Smith did not see anyone simulate a gun. He knew there were a lot of narcotics transactions and robberies at this bus stop and thought it unusual to see three Hispanics and two male Blacks together. He queried the license plate number of the vehicle on the mobile data computer and saw that it was registered and not stolen. He therefore abandoned the encounter and went to help officers at the bus stop.

Officer Smith learned that the car was registered to Elvina Mosley with an address on Marie Avenue in Los Angeles. He gave Officer Slavinskiy the license plate number, make, and model of the vehicle the suspect was driving. This information was broadcast. Officer Erik Mejia went to Mosley's apartment early the following day. Mosley allowed them to enter and search for the suspect, but he was not there. As they left, defendant rounded the corner, and they detained him. He had a bandaged ear, and he told them he was Sean Howard. Because defendant began to complain that he had asthma and heart trouble, the officers called an ambulance. Officer Mejia rode in the back of the ambulance and heard defendant say he damaged his ear in a fight. Officer Slavinskiy put

7

together a six-pack containing defendant's photograph and showed it to Abel. Abel identified defendant. Officer Slavinskiy later conducted an inventory search of the vehicle defendant had driven. Abel's cell phone was found in the center console, and one $20 bill was found in the back of the car. The cover to Abel's cell phone was subsequently found in defendant's pocket.

Officer Slavinkskiy's account of what the three victims told him differed from their testimony. The officer stated that they told the suspect they did not need a ride, and he simulated a gun and told them to go to his car. A second suspect opened all the car doors and told them to get in the car. Another suspect pushed one of them in the car. They drove through the alley behind the McDonald's restaurant and it was there that the suspect demanded their property. They did not say that defendant intervened when they were being harassed.

**Defense Evidence**

Defendant presented no evidence on his behalf.

## DISCUSSION

### I. Exclusion of Recorded 911 Call

#### A. *Defendant's Argument*

Defendant claims that the trial court erred and violated his constitutional rights to present a defense and confront witnesses against him by excluding as hearsay the tape recording of an anonymous 911 call. He asserts that, had the victims been effectively impeached with the evidence that they did not want the incident reported and then lied about that, a jury may not have believed their testimony that they were victims. Defendant asserts that the result of the trial likely would have been different.

#### B. *Transcript of Call*

The recorded 911 call was transcribed as follows:

"Caller: Um, hi. I'm calling from McDonald's right here on 43rd and Crenshaw and um, there seems to be some fighting going on outside. And there's this, some guy has some bleeding on his face and he asked if we could call the police. I think he was being jumped.

8

"Operator: [Inaudible] still fighting?

"Caller: Well, I think he's like running from them but yeah.

"Operator: [Inaudible] Paramedic?

"Caller: Um, no, no it's not that, I don't think it's that bad.

"Operator: Is he still there, the guy who left?

"Caller: Yeah, he just walked outside 'cuz he told me to call the police. And then right now he just said don't call them. So I don't know, I'm not sure.

"Operator: Don't call them?

"Caller: Yeah. He told me to call the police then he told me don't call them anymore. Well he's with some girls and the girls said not to call them. But he came begging, he came begging for us to call the police.

"Operator: Somebody beat him up?

"Caller: Yeah, I believe so.

"Operator: Okay, thank you.

"Caller: Alright [*sic*], thank you."

### *C. Proceedings Below*

Trial began on December 6, 2011, and defense counsel received the CD of the 911 call on that day. Prior to the testimony of the People's last witness, on December 14, 2011, defense counsel requested an Evidence Code section 402 hearing on the 911 call made by an anonymous caller "during the course of the emergency." The trial court requested a transcript and case law supporting the admission of the recording.

The court listened to the 911 recording after reading the transcript counsel had provided. At argument the following day, counsel contended that the recording was admissible as a spontaneous statement under Evidence Code section 1240.[2] The

---

[2]     Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

9

statements on the recording were made spontaneously while the declarant was under the stress of the excitement caused by "such perception." Counsel added that it related to an ongoing emergency. Counsel also offered the 911 call under Evidence Code section 1241[3] as a contemporaneous statement that was explaining the conduct of the declarant in calling 911. Defense counsel agreed with the trial court that a hearsay exception had to apply to the recording. Counsel added, however, that even if no hearsay exception applied, under *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*), the evidence should be admitted in order to comport with due process as long as it was trustworthy.

The prosecutor argued that, for the exception to the hearsay rule under Evidence Code section 1240 to apply, there had to be a reaction to some kind of exciting event rather than mere processing of information. The call in this case reflected the processing of information. The caller was not the victim and did not witness someone being beaten. As for the contemporaneous statement exception to the hearsay rule, the prosecutor stated that the caller hung up and then made a second call. This again appeared to be more similar to a processing of information than an excited utterance.

In making its ruling, the trial court stated, "It does not appear to the court that the statement is a spontaneous statement." The court noted that it had listened to the recording along with the parties. It did not appear to the court to meet the elements of a spontaneous statement. "Listening to the tape, the words on the tape, it doesn't appear to be excited." The recording also failed to meet the exception of a contemporaneous statement. The caller was not explaining conduct while the person is engaged in the conduct. The caller was narrating something that happened before.

---

**3** Evidence Code section 1241 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Is offered to explain, qualify, or make understandable conduct of the declarant; and [¶] (b) Was made while the declarant was engaged in such conduct."

### D. Relevant Authority

Inadmissible hearsay evidence is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Subject to certain recognized exceptions, hearsay evidence is inadmissible at trial. (Evid. Code, § 1200, subd. (b).) Trial courts exercise broad discretion in determining compliance with foundational requirements of exceptions to the hearsay rule. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 57-58.)

### E. No Abuse of Discretion

To be admissible under the spontaneous declaration exception to the hearsay rule, "'(1) there must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.'" (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) "'"Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the [declarant's] reflective powers were still in abeyance*."'" (*People v. Vines* (2011) 51 Cal.4th 830, 880.)

 A trial court's finding as to whether a statement satisfies the requirements of the spontaneous declaration exception will not be disturbed unless the facts on which the trial court relied are not supported by a preponderance of the evidence. (*People v. Poggi*, *supra*, 45 Cal.3d at p. 319.) "'"[E]ach fact pattern must be considered on its own merits."'" (*People v. Vines*, *supra*, 51 Cal.4th at p. 880.) "The discretion of the trial court is at its broadest when it determines whether the nervous excitement still dominated and the reflective powers were still in abeyance." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 590-591; *People v. Poggi*, *supra*, 45 Cal.3d at pp. 318-319.)

11

We conclude the trial court did not abuse its discretion when it determined that the 911 call was not admissible under the hearsay exception of Evidence Code section 1240. The cold record of the call does not reflect any nervous excitement on the part of the caller. The caller stated that paramedics were not needed because he did not think Abel's injuries were "that bad." Moreover, the statements were not spontaneous and unreflecting, since the caller was only making the call because he was asked to do so, and he was obviously reflecting on why the male had asked him to call and then told him not to call. There was no "stress of excitement" evident in the call.[4] (*People v. Washington* (1969) 71 Cal.2d 1170, 1176.) Moreover, although not always conclusive, the fact that much of what the declarant said was in response to questions from the Operator and was not spontaneous argues against admissibility in this case where there was no urgency to the call. (See *People v. Poggi, supra,* 45 Cal. 3d at p. 319 [whether a statement was made in response to a question is an important factor, though not dispositive, on "the issue of spontaneity"]; *People v. Brown* (2003) 31 Cal.4th 518, 541 ["'When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity. [Citations.]'"])

With respect to Evidence Code section 1241, defendant argues in his reply brief that the caller's statements were offered to explain his conduct, i.e., his reason for calling 911. Also, they were made while the caller was perceiving the victim's injuries and responding to his request to report and then not report the situation to the police. According to defendant, the trial court abused its discretion in finding the statement inadmissible because the declarant did not *testify* to his observations of the victim's injuries and statements, but Evidence Code section 1241 does not require that the declarant testify.

The trial court's ruling did not focus on the lack of testimony by the declarant. The court stated that the declarant was not explaining conduct while the person is

---

[4]     Defense counsel did not arrange for this court to receive the CD of the 911 call. This court's efforts to obtain the CD have proved fruitless.

engaged in the conduct but rather narrating something that happened before. In any event, we review the trial court's ruling, not its rationale. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1075, fn. 4.) In *People v. Hines* (1997) 15 Cal. 4th 997, 1034-1037, for example, the trial court excluded as hearsay a statement by murder victim Donna Roberts in a telephone call to a friend during the time that the defendant, Hines, was in her home. In the excluded statement, Roberts told her friend that defendant was present. The court ruled that the statement was not admissible under Evidence Code section 1241 to explain the conduct of Roberts, since her conduct was not in issue. Likewise in the instant case, although it is true (as defendant asserts) that the caller may have been explaining his reason for making the 911 call, the caller's conduct was not at issue. Defendant himself argues that it was the conduct of the girls and Abel that was at issue.

Defendant also argues that the exclusion of the 911 call was a denial of due process and should have been admitted under *Chambers*, *supra*, 410 U.S. 284. In that case, as a consequence of the state's particular hearsay rule, the defendant was unable to cross-examine a person who had previously confessed to the crime and then retracted his confession, and he was unable to present certain crucial witnesses, to whom the other person had also confessed his guilt. (*Id*. at pp. 294, 299.) *Chambers* stated that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." (*Id*. at p. 302.) The *Chambers* court reversed the judgment, stating that under the facts and circumstances of that case, the trial court's rulings deprived Chambers of a fair trial. (*Id*. at p. 303.) The court emphasized, however, that it was establishing no new principles of constitutional law nor diminishing the respect traditionally accorded to the States in the establishment and implementation of rules and procedures in criminal trials. (*Id*. at p. 302-303.)

According to defendant, the principal issue at trial was the nature and motive behind defendant's actions. He argues that, as in *Chambers*, the hearsay evidence (the 911 call) was crucial to his defense that he did not kidnap the three victims but was himself the victim of an assault. He maintains that the caller's statements that Kimberly

13

and Kiara did not want to report and that Abel changed his mind about reporting were critical to this defense. He claims that the call raises doubt about the victims' veracity regarding having been kidnapped and robbed and their status as victims. We disagree. The 911 call did not fall within a valid hearsay exception, and it was not, unlike the evidence in *Chambers*, crucial to the defense. Seen realistically, the declarant's statement that Abel begged him to call 911 and then told him not to call because the girls told him not to call does little to establish defendant's innocence. Abel himself testified that he asked the McDonald's employees to call, but they seemed confused, so he went toward some police car lights that he saw nearby. Whether or not the girls told him not to call would not have been interpreted by a reasonable jury as confirmation that their entire account of the kidnapping, robbery, and attempted robberies was a lie.

Defendant additionally argues that the erroneous exclusion of the 911 call violated his right to confront and cross-examine witnesses, guaranteed by the Sixth Amendment to the federal Constitution. With respect to his confrontation clause argument, defendant focuses on Kiara's insistence that she did not tell Abel not to call the police. He claims that impeachment with the 911 recording would have exposed not only her lies on the stand but also her motive for not wanting to report the incident, i.e., the fact that she was not a victim of any crime at all. Defendant argues that the error was not harmless because, had these victims been effectively impeached with evidence that they did not want the incident reported and lied about that, a jury may not have believed any of their testimony concerning their "victimhood" and reached a different verdict.

We observe that defendant did not object on this ground at trial, and therefore has not preserved the issue. (*People v. Alvarez* (1996) 14 Cal.4th 155, 186; *People v. Edwards* (1991) 54 Cal.3d 787, 835.) In any event, we do not believe the trial court violated the confrontation clause when it excluded the 911 call. Defense counsel had ample opportunity to cross examine the three victims as well as the police officers. Focusing on Kiara's testimony, as does defendant, the record shows that defense counsel pointed out to Kiara several instances where her preliminary hearing testimony contradicted her trial testimony, and Kiara denied that the transcripts accurately reported

14

her words, or she stated she did not remember saying them. Kiara denied that she told Abel not to call the police or that she told the McDonald's people not to. She acknowledged that she knew the police had been called from McDonald's and began to explain that she and the others left " 'cause we saw. . ." but defense counsel interrupted her answer by asking, "Why did you walk two blocks if you knew 911 had been called and the police were on their way?" Kiara merely answered, "I don't know."

Furthermore, defense counsel elicited from Officer Slavinskiy that he was not told many of the facts contained in the victims' testimony, or he was told different facts. For example, he testified that the victims said they were forced at simulated gunpoint to defendant's car, and that they said they were robbed in the alley behind McDonald's shortly after entering the car. They never said that they were harassed at the bus stop or that defendant came to their aid. Clearly, the lack of impeachment with the hearsay statements of a McDonald's employee regarding one small detail of the story did not result in a denial of confrontation or, if so, the exclusion of the 911 call relating this information was harmless error under any standard. (*Chapman v. California* (1967) 386 U.S. 18 [harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable probability the error did not affect the outcome].) "[U]nless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.) Given the extensive impeachment of the victim witnesses in this case, any error was harmless.

## II. Denial of New Trial Motion

### A. Defendant's Argument

Defendant contends the trial court abused its discretion by denying defendant's new trial motion, which was based on newly discovered evidence. This resulted in the denial of his due process right to a fair trial. He asserts that an independent review of the

15

evidence in support of his motion should compel this court to reverse his convictions and order a new trial at which the 911 call and the caller's testimony are admitted into evidence.

### B. Relevant Authority

Section 1181, subdivision 8 provides that a trial court may grant a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given. . . ." The trial court's decision to deny a new trial motion based on newly discovered evidence is reviewed for an abuse of discretion. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1251.)

In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits."' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328; see also *People v. Clauson* (1969) 275 Cal.App.2d 699, 706 ["newly discovered evidence must not be merely cumulative or impeaching; it must be such as to render a different verdict reasonably probable"]; *People v. Huskins* (1966) 245 Cal.App.2d 859, 862 ["[o]rdinarily, evidence which merely impeaches a witness is not significant enough to make a different result probable"].)

### C. Proceedings Below

Shortly before the sentencing hearing, defense counsel filed a motion for new trial, arguing that the court's ruling on the 911 call effectively deprived defendant of the ability to impeach the testimony of the witnesses in this case. The motion contained counsel's arguments, expressed during the Evidence Code section 402 hearing, regarding

16

admissibility of the contents of the 911 call. Counsel subsequently asked for a continuance because her investigator had found the McDonald's employee who made the 911 call, and counsel wished to serve him with a subpoena. She asked to amend her new trial motion to include points and authorities related to the discovery of new evidence, which she subsequently filed.

Counsel contended that the caller's identity was newly discovered evidence because the caller, Christian Miranda, was unknown at the time of trial but was now known. The identity of the caller was not merely cumulative because there was no other evidence at trial allowing defendant to impeach the victims about calling the police. A different result was probable because defendant would be able to establish two defenses (consent and lack of force or fear) and impeach the witnesses. Also, defendant could not have discovered the identity of the 911 caller with reasonable diligence in time for trial.

At the motion hearing, Miranda identified his voice on the 911 call and testified that he was working at the drive-through window when "a guy came up to the window, and he told me that there was somebody that was trying to hit him, and he told me to call the police, call the police. And he was with two girls. And I did. He just left after that." He later added that the two girls told him not to call 911. He also said that the guy "told me to call 911, and then, he moved for a bit, and when he came back, he told me not to call them anymore." The man went walking down Crenshaw Boulevard toward Stocker Street but came back within two minutes. He saw the man get angry with the girls and say, "It was all your fault." On cross-examination, Miranda said the man was bleeding from his face. He initially was begging Miranda to call the police.

In denying the motion, the trial court stated: "[T]he evidence is not newly discovered evidence. . . . The parties were aware of the 911 call. The question was the identity of the 911 caller. And—if the testimony would be considered as newly discovered, the parties did not use reasonable diligence. Now, I am not stating that the lawyer for the defense was not a diligent lawyer. . . . What I'm saying is, or the ruling is that defendant cannot demand a speedy trial knowing that there's evidence that [he] wants and then say, I found the evidence later; therefore, I acted diligently. . . . If the

17

defense wanted that evidence, [the] defense could have asked for a continuance, and the court would have granted that continuance. It was within the first 60 days. . . . [T]he case went to trial within 60 days. . . . And I don't believe [a continuance] was asked [for] during the trial either. So another option is that . . . if for some reason, this evidence was discovered during the trial, counsel could have asked for a continuance to seek the witness. That didn't happen either. But fundamentally, when [the] defense demanded to go to trial within 60 days, knowing the existence of this evidence, that does not fall within the concept of newly discovered evidence and due diligence to find that evidence. Finally, the evidence appears to be merely impeachment at best. In fact, the district attorney argued that that evidence would have assisted the prosecution in this case; i.e., corroborating the injuries to the victim from a third party, corroborating the [male] victim's testimony . . . that he went down the street and came back. So in fact, although some parts might be impeachment, some parts corroborate the People's case. . . . Given the evidence at trial, the introduction of the evidence [of the 911 call] would not render a different result reasonably probable."

### D. No Abuse of Discretion

We agree with the trial court. The evidence was known to the defense for a sufficient period of time, and if defendant had deemed it crucial to his defense, the trial court would have heard his motion for a continuance and granted it. Most importantly, the value of the evidence was merely to impeach the witnesses as to whether they told Miranda not to call the police. Counsel emphasized this below, stating that "one of the main reasons why that 911 call was crucial to the defense case was because it actually impeached the credibility of some of the witnesses." The call gives no indication as to the victims' reasons for cancelling the request. The witnesses testified that they saw police car lights down the street and went to the policemen there to report what had happened to them. And, as indicated in the previous section, the testimony of the victims was amply impeached on this point and others. Given the fact that the other evidence supported the victims' claims, including the evidence found in the car used by defendant,

18

we do not believe Miranda's testimony would have rendered a different result probable on a retrial of defendant's case.

Furthermore, as the People argued, Miranda's testimony was arguably more beneficial to the prosecution than to the defense in that Miranda described the victim as bleeding from the face, saying he had been beaten up, and begging for Miranda to call the police. Any argument that the victims did not want the police to come was flawed, since in that case they would never have asked Miranda to call the police in the first place or gone to the police down the street. These actions are not those of persons who want to avoid the police because they consented to the kidnapping and made up a story about being robbed.

We conclude the court did not abuse its discretion in denying defendant's new trial motion.

## III.  Prior Federal Conviction

### A.  Defendant's Argument

Defendant contends that the judgment of conviction for violating 18 United States Code section 2113 (U.S.C. section 2113) was not properly certified or authenticated. Because the records custodian of the Federal Correctional Complex at Victorville, California, did not herself examine and compare the photocopy of the judgment of United States District Judge Harry L. Hupp with the original or even a certified copy of the judgment, but merely attested to the correctness of the noncertified copies maintained by the Victorville institution, the custodian's certification does not meet the requirements of section 1530. The prosecutor also failed to present additional secondary authenticating evidence. Defendant asserts that the trial court's finding of a prior strike based on insufficient evidence violates due process.

### B.  Relevant Authority

To qualify as a strike under the Three Strikes law, a prior conviction must be a serious felony, as defined in section 1192.7, subdivision (c), or a violent felony, as defined in section 667.5, subdivision (c). The prosecution must prove the serious or violent nature of the offense beyond a reasonable doubt, and may do so with court

documents prepared contemporaneously with the conviction by a public officer charged with that duty, such as an abstract of judgment. (*People v. Delgado* (2008) 43 Cal.4th 1059, 1065-1066; *People v. Miles* (2008) 43 Cal.4th 1074, 1082 (*Miles*).) "However, if the prior conviction was for an offense that can be committed in multiple ways, and the record of the conviction does not disclose how the offense was committed, a court must presume the conviction was for the least serious form of the offense. [Citations.] In such a case, if the serious felony nature of the prior conviction depends upon the particular conduct that gave rise to the conviction, the record is insufficient to establish that a serious felony conviction occurred." (*Miles*, at p. 1083.)

"On the other hand, the trier of fact may draw *reasonable inferences* from the record presented. Absent rebuttal evidence, the trier of fact may presume that an official government document, prepared contemporaneously as part of the judgment record and describing the prior conviction, is truthful and accurate. Unless rebutted, such a document, standing alone, is sufficient evidence of the facts it recites about the nature and circumstances of the prior conviction." (*Miles*, *supra*, 43 Cal.4th at p. 1083.)

"On review, we examine the record in the light most favorable to the judgment to ascertain whether it is supported by substantial evidence. In other words, we determine whether a rational trier of fact could have found that the prosecution sustained its burden of proving the elements of the sentence enhancement beyond a reasonable doubt." (*Miles*, *supra*, 43 Cal.4th at p. 1083.)

### C. Proceedings Below

John Helbling, a paralegal for the district attorney's office, testified for the prosecution at the trial on the prior convictions. He testified regarding People's Exhibit 21, a 10-page document from the United States Department of Justice, Federal Bureau of Prisons. The last page shows that the official custodian of records—the case management coordinator—at the Federal Correctional Complex, Victorville, certified that the attached records were true and correct copies of that institution's records pertaining to Sean D. Howard and consisting of a photograph, judgment and commitment order, fingerprints, and a "PPPI." The records were sworn to on October 20, 2011.

20

As Helbling testified, the documents showed a verdict of guilty of "conspiracy to commit armed bank robbery, in violation of 18 USC 371, as charged in Count 1; armed bank robbery, in violation of 18 USC 2113(a)(d), as [charged] in Count 2; use of a firearm during a crime of violence, in violation of 18 USC 924(c), as charged in Count 3 of the First Superseding Indictment."

The Judgment form also stated that full restitution had not been ordered in view of the defendant's lack of resources. Defendant was committed to the custody of the Bureau of Prisons for a total term of 188 months. Additionally, Exhibit 21 included a Judgment and Commitment Order Re: Violation of Supervised Release in the case of *United States of America v. Sean Deandre Howard*, case No. CR 94-908-VBF-3, dated December 20, 2010, revoking defendant's supervised release and committing him to the custody of the Bureau of Prisons for a term of four months. A handwritten notation reflects that defendant was delivered on February 1, 2011, to "VIM at Victorville."

Defense counsel had no objection to Exhibit 21 pages 1 through 6, defendant's print cards, or booking photograph. Counsel did, however object to the abstract of judgment because it was kept by the court system and there was no proper foundation that it was a document certified by the prison system. The prosecutor responded that the correctional case records analyst had certified that the attached documents, including the abstract of judgment and the minute orders, were true and correct copies of the originals she had in custody, so they were in fact certified copies of the originals. Counsel responded that the certifications said that these were records of the documents that they had in their institution—they were not certifying the documents themselves. The trial court overruled the objections. Counsel further argued that, based on the records provided, the court could not beyond a reasonable doubt determine if the conviction was a strike because the court had no facts about the case. Counsel argued that the court was left with making assumptions about whether there was personal use of a firearm as opposed to a principal's use of a firearm or an accomplice being armed.

The court ruled that Exhibit 21 actually showed an armed bank robbery. The judgment and commitment order showed a conviction of conspiracy to commit armed

21

bank robbery and a separate count of armed bank robbery in violation of U.S.C. section 2113(a)(d). Even if this document were not admissible for some reason, the offenses were also described in the public information data in the same Exhibit 21, and it showed a violation of U.S.C. section 2113(a)(d). Therefore, the strike had been proved.

### D. Evidence Sufficient

Defendant asserts that U.S.C. section 2113(a) consists of two offenses. One requires the taking of bank property by force, violence or intimidation. The other sets forth the offense of entering the bank with felonious or larcenous intent, which is a nonserious felony in California. Defendant claims he was denied due process based on insufficient evidence of the serious or violent nature of his prior bank robbery conviction that would support the additional five-year and Three Strikes terms imposed. (§ 667, subds. (a), (b)-(i).) Defendant argues that there is lacking any indication as to whether he was found guilty as an accomplice or an aider and abettor of the use of a firearm, which would indicate whether the more serious prong of subdivision (a) was violated. Hence, defendant asserts, there was no proof of a serious felony beyond a reasonable doubt.

Defendant is correct in that the first paragraph of U.S.C. section 2113(a) describes an offense that is a strike under California law, but the second paragraph does not. (*Miles*, *supra*, 43 Cal.4th at pp. 1081-1082.) "Though there is no California convictable offense of bank robbery, Penal Code section 1192.7, subdivision (c) lists a crime of this name as a serious felony, a prior conviction for which may enhance the sentence for a subsequent offense. ([§ 1192.7], subd. (c)(19).) For this purpose, Penal Code section 1192.7 defines '"bank robbery"' as 'to take or attempt to take, by force or violence, or by intimidation from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association.' (*Id.*, subd. (d).)" (*Miles*, at p. 1081.) In comparison, U.S.C. section 2113(a)'s second paragraph requires mere entry into a bank or other such institution with the intent to commit any felony affecting that institution. (*Miles*, at pp. 1080-1081.) As a result, "evidence that the defendant

22

suffered a previous conviction under section 2113(a), standing alone, cannot establish that the conviction was for a serious felony under California law." (*Miles*, at p. 1082.)

In *Miles*, to prove that a prior conviction for a violation of U.S.C. section 2113(a) qualified as a strike, the People introduced the form "Judgment and Probation/ Commitment Order," signed by the federal judge. The form recited that the defendant pleaded guilty to a "'violation of 18 U.S.C. 2113(a)(d)(e), armed bank robbery and . . . kidnapping, as charged in the First Count of the Indictment.'" (*Miles*, *supra*, 43 Cal.4th at p. 1079.) The *Miles* court held that where there was substantial evidence of the defendant's federal bank robbery conviction under U.S.C. section 2113(a), but the judgment also included another subdivision such as U.S.C. section 2113(d), or (e) (kidnapping), the more reasonable inference was that the underlying offense involved the force, violence, or intimidation required under the first paragraph of U.S.C. section 2113(a). U.S.C. section 2113(d) (of which defendant here also was found guilty in count 2) provides a greater punishment for any person who, "in committing, or in attempting to commit, any offense defined in subsection[] (a) . . . assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device." Consequently there was a very strong inference the prior federal offense in *Miles* qualified as a strike under California law. (*Miles*, at pp. 1088, 1092.)

In the instant case, the prosecution provided documentary evidence of more than defendant's conviction under U.S.C. section 2113(a). Rather, as in *Miles*, there was reliable evidence that defendant committed an armed bank robbery under U.S.C. sections 2113(a) *and* 2113(d). Defendant was also convicted in count 3 of violating 18 United States Code section 924(c) (count 3), which provided additional punishment for any person who, "during and in relation to any crime of violence . . . uses or carries a firearm." Thus, the prosecution's certified documentary evidence showed that defendant committed federal bank robbery by either assaulting a person or putting a person's life in jeopardy by using a dangerous weapon (U.S.C. § 2113(d)), or by using a firearm in the commission of the crime (18 U.S.C. § 924(c)). "Where, as here, the statutory provision includes more than one form of offense, one may reasonably infer, absent contrary

23

indicia, that the additional prose [in the judgment] is not mere surplusage, but an attempt to delineate which form was violated." (*Miles*, *supra*, 43 Cal.4th at p. 1085.)

As *Miles* explained: "It is highly unlikely that one charged and convicted under [U.S.C.] section 2113(a) only for entering a bank with felonious or larcenous intent, without an attempted or actual taking of property by force and violence or intimidation, would also be found, in the course of the offense, to have placed a victim's life in jeopardy by use of a dangerous weapon . . . . In the absence of any rebuttal evidence as to the nature of the prior conviction, the trial court was entitled, prima facie, to draw the more reasonable inference that it was for committing the California serious felony of bank robbery." (*Miles*, *supra*, 43 Cal.4th at p. 1088.)

With respect to defendant's theories as to how the offense of which he was found guilty could have been committed without force or violence or personal use of a gun, we note that *Miles* stated that the mere theoretical possibility that a defendant might have committed the armed bank robbery under U.S.C. section 2113(d) while merely entering the bank with felonious or larcenous intent would not be sufficient to require the California court to disregard the more reasonable, contrary inference—at least where there was no rebuttal evidence. (*Miles*, *supra*, 43 Cal.4th at pp. 1088-1089, fn. 10.) As the *Miles* decision stated, "One can perhaps *conceive* of a scenario in which violations of sections 2113(d) and 2113(e) might attach to a charged violation of section 2113(a) that did not involve an attempted or actual taking of property. For instance, such a charge and conviction might theoretically occur if defendant had entered the bank brandishing a weapon, was confronted by security guards before he could take or demand money or property, then assaulted or killed someone, or seized and moved a hostage, while attempting to escape. But, in the absence of rebuttal evidence, a trial court assessing a prior conviction described as for 'armed bank robbery' was not required to parse such remote possibilities. It could, as indicated, accept the more reasonable inference that the conviction was for what California would deem the serious felony of bank robbery." (*Miles*, at pp. 1088-1089, fn. 10.)

24

As is in *Miles*, while presenting no affirmative defense, defendant merely asserts the abstract possibility that defendant committed the robbery while an aider or abettor to an armed principal or as a mere accomplice. These assertions are pure speculation in the face of defendant's U.S.C. section 2113(d) conviction for assault or jeopardizing the life of any person by the use of a dangerous weapon, along with Judge Huff's indication that some amount of money was taken during the bank robbery.[5] Finally, we note that nothing in the *Miles* opinion indicates that the kidnapping aspect of the federal conviction was necessary for the underlying conviction to qualify as a serious felony under California law.

We also conclude that the records presented were an admissible form of evidence to prove a strike allegation. (§ 969b; *Miles*, *supra*, 43 Cal.3d at pp. 1077-1078; see also *People v. Prieto* (2003) 30 Cal.4th 226, 258 ["'prior convictions are normally proven by the use of documentary evidence alone.' [Citation.]"].) Here, the documents obtained by the district attorney's paralegal contained the certificate of records from the United States Department of Justice, Federal Bureau of Prisons, which was signed by the custodian of records. Among the documents was the "Judgment and Probation/Commitment Order" by United States District Court Judge Harry L. Hupp, dated May 1, 1996. Section 969b provides: "For the purpose of establishing prima facie evidence of the fact that a person . . . has been convicted of an act . . . declared to be a crime by any act or law of the United States, . . . copies of records of any . . . federal penitentiary in which such person has been imprisoned, when such records . . . have been certified by the official custodian of such records, may be introduced as such evidence." Thus, the records certified by the custodian of records at the Federal Correctional Complex, Victorville, where defendant apparently served his sentence for the violation of his supervised release in the bank robbery case, were admissible evidence. We also reject defendant's assertion that because the certification lists "JUDGMENT AND COMMITMENT ORDER" in the

---

[5] The Judgment and Commitment Order state that, "Full restitution has not been ordered in view of the defendant's lack of resources and limited future earning ability."

25

singular, the certification necessarily refers solely to the judgment and commitment order for defendant's 2010 incarceration for violation of supervised release.

Under the reasoning of *Miles,* we find the notations of "armed bank robbery" and "use of a firearm during a crime of violence" on the judgment form, in the absence of any rebuttal evidence, constitutes substantial evidence that the conviction in case No. CR-94-908(A)-HLH qualified as a strike under the Three Strikes law.

## IV. Restitution Fine

### A. Defendant's Argument

Defendant points out that the trial court's $15,000 restitution fine exceeded the $10,000 maximum permitted by section 1202.4, subdivision (b)(1).  Defendant also argues that there was no factual or rational basis for imposing a restitution fine exceeding the statutory minimum in this case, and the fine must be considered arbitrary.

### B. Relevant Authority

Section § 1202.4, subdivision (b)(1) provides that "If the person is convicted of a felony, the [restitution] fine shall not be less than two hundred forty dollars ($240) . . . and not more than ten thousand dollars ($10,000)."  Section § 1202.45, subdivision (a) provides for a parole revocation restitution fine "in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."  (See *People v. Blackburn* (1999)72 Cal.App.4th 1520, 1534 [maximum restitution fine is $10,000 "'regardless of the number of victims or counts involved'"].)  The court has wide discretion in determining the amount of the fine.  (*People v. Urbano* (2005) 128 Cal.App.4th 396, 406.)

### C. Restitution Fine Must Be Reduced

As respondent concedes, the restitution and parole revocation fines of $15,000 are excessive in that they exceed the $10,000 statutory maximum.  Respondent disagrees with defendant's assertion that a restitution amount must be reduced to an amount commensurate with the victims' actual losses, which were only slightly higher than the $200 statutory minimum in effect at the time the crime was committed.  (Stats. 2011, ch. 45, § 1.)

We agree with respondent.  Section 1202.4 subdivision (b)(1) provides that "[t]he restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense."  In the instant case, the trial court indicated it wished to impose the maximum amount as a restitution fine.  We believe that the maximum fine of $10,000 would not be arbitrary and excessive, nor would it violate the Eighth Amendment.

Section 1202.4, subdivision (d) provides:  "In setting the amount of the fine . . . in excess of the minimum fine . . . the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime.  Those losses may include pecuniary losses to the victim . . . as well as intangible losses, such as psychological harm caused by the crime. . . .  A defendant shall bear the burden of demonstrating his or her inability to pay.  Express findings by the court as to the factors bearing on the amount of the fine shall not be required."

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality:  The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."  (*United States v. Bajakajian* (1998) 524 U.S. 321, 334; see also *People v. Urbano*, *supra*, 128 Cal.App.4th at p. 406.)  In *United States v. Bajakajian*, cited by defendant, a fine of $357,144 was found disproportionate to the offense of failing to report exported currency because the defendant's culpability was minimal, the harm caused was minimal, and the maximum sentence under the federal sentencing guidelines was six months and a $5,000 fine. (*United States v. Bajakajian*, at pp. 338-339.)

In the instant case, defendant, in the guise of a Good Samaritan, kidnapped three young persons, two of whom were minor females.  He frightened them and threatened to shoot them with a firearm, which they believed he had, and attempted to rob all three of them.  He succeeded in robbing Abel, taking his cell phone and cash.  He drove them

27

around for a considerable amount of time, all the while pretending that he would take them home, as the victims became increasingly frightened for their lives. In addition, defendant was found to have suffered two prior serious or violent felony convictions, and the probation report reflects a long criminal history (beginning in 1983), interrupted only by periods of incarceration. In contrast to *United States v. Bajakajian*, defendant's culpability was not minimal. As the trial court stated in rejecting counsel's argument for concurrent sentencing, defendant acted as "a predator" who took the three victims away from a place of relative safety—a public street with police officers nearby. We believe that the trial court would not impose less than a $10,000 restitution fine, and we conclude this amount would not be an abuse of discretion. We therefore reduce the amount of the restitution fine to $10,000. (See *People v. Blackburn*, *supra*, 72 Cal.App.4th at p. 1534 [reducing excessive fine to statutory maximum].)

## V. Omission in Abstract of Judgment

Respondent correctly points out that the abstract of judgment does not indicate in the appropriate section that defendant was convicted under the Three Strikes law. We will direct the superior court to amend the abstract accordingly.

## DISPOSITION

The judgment is modified to reduce the restitution fine and parole revocation fine to $10,000. In all other respects, the judgment is affirmed. The superior court is directed to amend the abstract of judgment to reflect in item No. 8, by checking the appropriate box, that defendant was sentenced pursuant to Penal Code, section 667, subdivisions (b-(i) or Penal Code section 1170.12.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:

CHAVEZ, J.                    FERNS, J.*

_____
*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant
to article VI, section 6 of the California Constitution.